**FAEGRE DRINKER BIDDLE & REATH LLP**
Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Telephone:    +1 415 591 7500
Facsimile:    +1 415 591 7510

Tracey Salmon-Smith (*Pro hac vice*)
tracey.salmonsmith@faegredrinker.com
600 Campus Drive
Florham Park, New Jersey 07932
Telephone:    +1 973 549 7038
Facsimile:    +1 973 360 9831

Attorneys for Defendants
JOHN A. MITCHELL and BENJAMIN C. CARR

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITBANK, N.A. and CITIGROUP GLOBAL MARKETS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN A. MITCHELL and BENJAMIN C. CARR, <br><br> Defendants. | Case No. 3:24-CV-08224 (CRB) <br><br> **DECLARATION OF TRACEY SALMON-SMITH, ESQ.** |

I, TRACEY SALMON-SMITH, declare as follows:

1.     I am a Partner at the law firm of Faegre Drinker Biddle & Reath LLP. I am counsel to Defendants John A. Mitchell and Benjamin C. Carr.

2.     Attached as Exhibit A are a true and correct copies of internet searches revealing publicly available CD rates from Citi and BMO, respectively.

3.     Attached as Exhibit B is a true and correct copy of Citi Group Global Market, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Extraordinary Injunctive relief, filed in *U.S. BankCorp Investments, Inc. v. Ursoveich and Citi Global Markets Inc.*, 07-cv-00284 (E.D.

Ill. 2007).

    4.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Tracey-Salmon Smith

# Exhibit A

 **FDIC** *FDIC-Insured – Backed by the full faith and credit of the U.S. Government*
Citibank, N.A.

ATM / BRANCH 

 ESPAÑOL

Credit Cards    Banking    Lending    Investing    Wealth Management

Open an Account (/banking/bank-accounts? intc=citihpmenu_overview_bank-accounts)    Sign On

ESPAÑOL

Products & pricing based on your home address    Change

# Certificate of Deposit Account Rates

Check today's rates on savings accounts, CDs, IRAs, personal loan and line of credit and mortgage.

Select type of rate

Certificate of Deposit

Already a customer? To apply with a pre-filled application, **sign on**

## Certificates of Deposit

**Learn more about CDs**

Select Apply Now to open a CD with everyday benefits. Or get started in a Relationship Tier (/banking/cd-account) if you're a New to Relationship customer and plan to keep a Combined Average Monthly Balance of at least $30,000 within 3 calendar months.[1]

Compare features and benefits

Fixed Rate CD

Feedback

## Featured Rates

| 6-Month | 7-Month | 11-Month |
|---|---|---|
| **APY** | **APY** | **APY** |
| 3.25% | **4.00%** | 3.50% |
| **Apply Now** (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... | **Apply Now** (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... | **Apply Now** (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |

| Term Length | APY | Interest Rate | |
|---|---|---|---|
| **3-Month**[1] See less | 0.05% | 0.05% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |
| All balance ranges | 0.05% | 0.05% | |
| **4-Month**[1] See less | 0.05% | 0.05% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |
| All balance ranges | 0.05% | 0.05% | |
| **5-Month**[1] See less | 0.05% | 0.05% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |
| All balance ranges | 0.05% | 0.05% | |
| Featured Rate **6-Month**[1] See less | 3.25% | 3.20% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |
| All balance ranges | 3.25% | 3.20% | |
| Featured Rate **7-Month**[1] See less | 4.00% | 3.92% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom... |

| | | | |
|---|---|---|---|
| All balance ranges | 4.00% | 3.92% | |
| **8-Month**[1] See less | 0.05% | 0.05% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |
| All balance ranges | 0.05% | 0.05% | |
| **9-Month**[1] See less | 2.25% | 2.23% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |
| All balance ranges | 2.25% | 2.23% | |
| **10-Month**[1] See less | 0.05% | 0.05% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |
| All balance ranges | 0.05% | 0.05% | |
| Featured Rate **11-Month**[1] See less | 3.50% | 3.44% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |
| All balance ranges | 3.50% | 3.44% | |
| **1-Year**[1] See less | 2.25% | 2.23% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Pr |
| All balance ranges | 2.25% | 2.23% | |
| **13-Month**[1] See less | 0.10% | 0.10% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |
| All balance ranges | 0.10% | 0.10% | |
| **14-Month**[1] See less | 0.10% | 0.10% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Prom |

Feedback

| | | |
|---|---|---|
| All balance ranges | 0.10% | 0.10% |

| **15-Month**[1] See less | 0.50% to 1.01% | 0.50% to 1.00% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo |
|---|---|---|---|
| Below $100,000 | 0.50% | 0.50% | |
| $100,000+ | 1.01% | 1.00% | |

| **18-Month**[1] See less | 2.45% | 2.42% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo |
|---|---|---|---|
| All balance ranges | 2.45% | 2.42% | |

| **2-Year**[1] See less | 2.00% | 1.98% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Pr |
|---|---|---|---|
| All balance ranges | 2.00% | 1.98% | |

| **30-Month**[1] See less | 0.10% | 0.10% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo |
|---|---|---|---|
| All balance ranges | 0.10% | 0.10% | |

| **3-Year**[1] See less | 2.00% | 1.98% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Pr |
|---|---|---|---|
| All balance ranges | 2.00% | 1.98% | |

| **4-Year**[1] See less | 2.00% | 1.98% | Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Pr |
|---|---|---|---|
| All balance ranges | 2.00% | 1.98% | |

**5-Year**[1]  2.00%  1.98%

See less

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Pr...

All balance ranges  2.00%  1.98%

**3-Month**[1]

APY  0.05%

Interest Rate  0.05%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_3

See less

All balance ranges

**4-Month**[1]

APY  0.05%

Interest Rate  0.05%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_4

See less

All balance ranges

**5-Month**[1]

APY  0.05%

Interest Rate  0.05%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_5

See less

Feedback

All balance ranges

**6-Month**[1]

APY     3.25%

Interest Rate     3.20%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 6

See less

All balance ranges

**7-Month**[1]

APY     4.00%

Interest Rate     3.92%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 7

See less

All balance ranges

**8-Month**[1]

APY     0.05%

Interest Rate     0.05%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 8

See less

All balance ranges

**9-Month**[1]

| APY | 2.25% |
| --- | --- |

| Interest Rate | 2.23% |
| --- | --- |

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 9

See less

All balance ranges

### 10-Month[1]

| APY | 0.05% |
| --- | --- |

| Interest Rate | 0.05% |
| --- | --- |

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 1

See less

All balance ranges

### 11-Month[1]

| APY | 3.50% |
| --- | --- |

| Interest Rate | 3.44% |
| --- | --- |

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD= 1

See less

All balance ranges

### 1-Year[1]

| APY | 2.25% |
| --- | --- |

| Interest Rate | 2.23% |
| --- | --- |

**Apply Now** (https://online.citi.com/US/aq/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_1

See less

All balance ranges

### 13-Month[1]

| APY | 0.10% |
|---|---|
| Interest Rate | 0.10% |

**Apply Now** (https://online.citi.com/US/aq/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_1

See less

All balance ranges

### 14-Month[1]

| APY | 0.10% |
|---|---|
| Interest Rate | 0.10% |

**Apply Now** (https://online.citi.com/US/aq/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_1

See less

All balance ranges

### 15-Month[1]

| APY | 0.50% to 1.01% |
|---|---|
| Interest Rate | 0.50% to 1.00% |

**Apply Now** (https://online.citi.com/US/aq/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_1

See less

Below $100,000

$100,000+

**18-Month**[1]

APY        2.45%

Interest Rate      2.42%

Apply Now  (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_1

See less

All balance ranges

**2-Year**[1]

APY        2.00%

Interest Rate      1.98%

Apply Now  (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_2

See less

All balance ranges

**30-Month**[1]

APY        0.10%

Interest Rate      0.10%

Apply Now  (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_3

See less

All balance ranges

**3-Year**[1]

APY     2.00%

Interest Rate     1.98%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=  3

See less

All balance ranges

**4-Year**[1]

APY     2.00%

Interest Rate     1.98%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=  4

See less

All balance ranges

**5-Year**[1]

APY     2.00%

Interest Rate     1.98%

Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=  5

See less

All balance ranges

## Term Length

**APY**

0.05%

All balance ranges

0.05%

**Interest Rate**

0.05%

All balance ranges

0.05%



Apply Now (https://online.citi.com/US/ag/account-opening/index?product_list=certificateDeposit&GS=NJ&Promo_ID=4XF5VEJWSPDRPB&cst=10&typeCD=_3_month_cd)

All balance ranges

# Contact us



**View your statement**

If you've already opened your CD and also have a Citi
checking or savings account, you can easily check the
rate by viewing your statement.



1-800-321-2484 (tel:18003212484)

TTY: We accept 711 or other Relay
Service (tel:18009929833)

**INVESTMENT AND INSURANCE PRODUCTS:NOT INSURED BY THE FDIC • NOT
INSURED BY THE FEDERAL GOVERNMENT OR ANY OTHER FEDERAL GOVERNMENT
AGENCY, BY THE BANK, OR BY ANY AFFILIATE OF THE BANK • NOT A DEPOSIT OR
OTHER OBLIGATION OF, OR GUARANTEED BY, THE BANK OR AN AFFILIATE OF THE
BANK • SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE
PRINCIPAL INVESTED**

⌄ **¹Product & Pricing Information**

† Annual Percentage Yield (APY) is accurate as of 11/24/2024. The Composite Annual Percentage Yield (APY) for the Step Up CD is accurate as of 11/24/2024 and is
based on the 3 fixed initial interest rates shown for Months 1 through 10, Months 11 through 20, and Months 21 through 30. APYs are subject to change before a term
begins for new and renewing CDs. The APY assumes interest remains on deposit in the CD account until maturity. Credited interest may be withdrawn without penalty. A
withdrawal will reduce earnings. A penalty will be imposed for early withdrawal of principal. Fees could reduce account earnings. The No Penalty CD allows withdrawal of
the full balance and interest without penalty after the first 6 days you make the minimum deposit into your new CD and your deposit has been fully collected. An early
withdrawal penalty applies to withdrawals from a No Penalty CD during the first 6 days. Partial withdrawals, including interest withdrawals, from a No Penalty CD are not
permitted. $500 minimum deposit required.

When the APY is based on account balance, the applicable balance range will be used to determine your APY and interest rate; account balance may not be a factor for all
CD terms. Citi may assign the same APY to more than one balance range.

Balance ranges include:
$0 - $9,999.99
$10,000 - $24,999.99
$25,000 - $49,999.99
$50,000 - $99,999.99
$100,000 - $499,999.99
$500,000 - $999,999.99
$1,000,000+

**No Penalty CDs automatically renew without the no penalty feature to a 12 month CD. Step Up CDs automatically renew without the step up feature to a 30 month CD.**All CDs automatically renew at maturity for the same term at the rates in effect on the CD renewal date. There is a grace period of up to 7 calendar days after the maturity date. You can make a change during the grace period without penalty. The CD opening date (renewal date) and maturity date will reset if you make a change during the grace period, and you will not be able to make any changes until the next maturity date without penalty.

For full terms and conditions please view the Client Manual Agreement (https://online.citi.com/JRS/popups/ao/CDAA.pdf) and Account Agreement and Notices (https://online.citi.com/JRS/portal/template.do?ID=Consumer-Deposit-Account-Agreements) page. To apply online, you must be a U.S. citizen or a U.S. resident alien and at least 18 years old. You'll need to provide a physical address in the U.S., date of birth and applicable identification documentation which may include a Social Security Number or Individual Taxpayer Identification number.

Deposit products are provided by Citibank, N.A. Member FDIC. Only bank deposit products are FDIC insured.

Deposits are FDIC insured up to $250,000 per depositor, for each account ownership category. To learn more visit www.fdic.gov.

Zelle® and the Zelle® related marks are wholly owned by Early Warning Services, LLC and are used herein under license.

PayPal.com and the PayPal logo are trademarks of PayPal Holdings, Inc., or its affiliates. PayPal terms and conditions apply.

Venmo is a service of PayPal, Inc., a licensed provider of money transfer services (NMLS ID: 910457). All money transmission is provided by PayPal, Inc. pursuant to PayPal, Inc.'s licenses.

Certain other trademarks listed above are owned by third parties not affiliated with Citibank.

World Wallet® services are provided by Citibank, N.A. World Wallet is a registered service mark of Citigroup, Inc.

©2024 Citigroup Inc. Citi, Citi and Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world.

---

**Why Citi**

---

**Wealth Management**

---

**Business Banking**

---

**Rates**

---

**Help & Support**

---

 

---

© 2024 Citigroup Inc

Terms & Conditions (/termsdisclaimer/termsdisclaimerhome)

Privacy (/policies/us-privacy-notice-for-consumers)

Notice at Collection (/policies/us-privacy-notice-for-consumers#info-collect)

Do Not Sell or Share My Personal Information (/dataprivacyhub)

Accessibility (/accessibility)

Feedback

**Important Legal Disclosures & Information**

Citibank.com provides information about and access to accounts and financial services provided by Citibank, N.A. and its affiliates in the United States and its territories. It does not, and should not be construed as, an offer, invitation or solicitation of services to individuals outside of the United States.

Terms, conditions and fees for accounts, products, programs and services are subject to change. Not all accounts, products, and services as well as pricing described here are available in all jurisdictions or to all customers. Your eligibility for a particular product and service is subject to a final determination by Citibank. Your country of citizenship, domicile, or residence, if other than the United States, may have laws, rules, and regulations that govern or affect your application for and use of our accounts, products and services, including laws and regulations regarding taxes, exchange and/or capital controls that you are responsible for following.

The products, account packages, promotional offers and services described in this website may not apply to customers of International Personal Bank U.S. (https://online.citi.com/JRS/portal/template.do?ID=international-personal-bank&l=en&locale=en_US) in the Citigold® Private Client International, Citigold® International, Citi International Personal, Citi Global Executive Preferred, and Citi Global Executive Account Packages.

Deposit products and services are offered by Citibank, N.A., Member FDIC

Feedback



**BMO**    🔒 SIGN IN    ☰

Savings Accounts, Money Markets and CDs Return to savings accounts  ›

## Certificate of Deposit (CDs)[1]

Like guaranteed growth, locked-in interest rates and complete protection against the variability of the markets? BMO CDs are for you if you want competitive CD rates and flexible term options in exchange for storing your money longer.

## Lock in these CD Specials when you open today

We offer different types of CDs with varying rates and term options. Check out these CD Specials.

These rates are effective as of November 24, 2024.

Rates for ZIP code: **94304**  CHANGE

13 Mo    25 Mo    35 Mo    45 Mo    59 Mo

# 4.00%

## Annual Percentage Yield (APY)[1]

OPEN IN MINUTES

**$1,000 minimum deposit required**

**CD closing and withdrawal methods:** CDs may only be closed or funds withdrawn by contacting a branch or Customer Contact Center at 1-800-546-6101. CD funds may be transferred to another BMO deposit account or a check mailed to the address listed on the CD account.

**Prefer to open an account in branch?**
**We're here to help.**    FIND A BRANCH

## Standard CD

With as little as $1,000, you can begin earning a steady interest rate for the term of your Standard CD.

| Features | Terms start at 3 months, with opening deposits as low as $1,000. |
|---|---|

$1,000 minimum balance required

✓    3 month - 5 year terms    ✓    Lock in your rate

**Open a Standard CD Today!**

Minimum balance

Select minimum balance

Term

Select a term

( OPEN IN MINUTES )    ( FIND A BRANCH )

These rates are effective as of November 24, 2024.

Select minimum balance amount

**$1,000**

Rates for ZIP code: **94304** CHANGE

| Term | Interest Rate (%) | APY[1] (%) |
|------|------|------|
| 3 months | 0.050% | 0.05% |
| 6 months | 0.050% | 0.05% |
| 9 months | 0.050% | 0.05% |
| 12 months | 1.980% | 2.00% |
| 18 months | 1.686% | 1.70% |
| 24 months | 1.489% | 1.50% |
| 30 months | 1.390% | 1.40% |
| 36 months | 1.341% | 1.35% |
| 48 months | 1.341% | 1.35% |
| 60 months | 1.341% | 1.35% |

**Open a Standard CD Today!**

Minimum balance

Select minimum balance

Term

Select a term

( OPEN IN MINUTES )    ( FIND A BRANCH )

These rates are effective as of November 24, 2024.

## Terms & Agreements

📄 **All CDs opened online - Product Disclosure (PDF, 325 KB)**     📄 **Deposit Account Agreement (PDF, 368 KB)**

## Save with a guarantee





**FDIC**

### Get our competitive rates of return

Let your money grow with our high-rate secure CDs.

### Security however you bank[4]

Whether you bank via mobile[5], online or telephone, all your banking methods are convenient and secure.

### FDIC Insured[2]

Enjoy peace of mind knowing that your money is safe and secure.

## Is a Certificate of Deposit (CD) right for you?

Compare the features of savings products to find the saving solution that fits you best.

| | Current APY | VIEW RATES | VIEW RATES | VIEW RATES |
|---|---|---|---|---|
| Access your money | | Yes[3] | At Maturity | Yes |
| Minimum opening deposit | | $25 | $1,000 | $25 |

**Relationship Plus Money Market**

| | |
|---|---|
| Current APY | |
| Access your money | |

Minimum opening deposit

**LEARN MORE**

○ ○ ○

Prefer to open an account in branch?
We're here to help.

**FIND A BRANCH**

## Certificate of Deposit (CD) FAQs

What is a Certificate of Deposit (CD)?  ⌄

Are there monthly maintenance fees on a CD? What other fees are there?  ⌄

What is the minimum opening deposit?  ⌄

What CD interest rates do you offer? How much can I earn at your current CD rates?  ⌄

What if I need to close my CD before maturity? Can I add money or change the term of my CD?  ⌄

When my CD matures, how will I be notified and how long will I have to take money out?  ⌄

**Resources for your savings journey**







**What you need to know about CD laddering ›**

When it comes to financial planning for your short- and long-term goals, saving and investing are...

**Need support?**
**That's what we're here for.**

 **Ask us anything**

Give us a call if you have any questions.

📞 **1-800-546-6101**

 **Come in and talk to us**

Drop by your nearest branch to chat about your financial future.

**BOOK AN APPOINTMENT ›**

**Legal**

1 Early withdrawal penalties may apply. Annual Percentage Yields (APYs) are accurate as of the date stated and are subject to change at any time. For current rate information, contact your banker or call us at 1-800-546-6101. To receive these APYs, you must open your account online, by phone at 1-888-340-2265, or at a branch. CDs opened online can only be in individual or joint ownership and cannot be for an IRA. For CDs opened online, funds may not be withdrawn for 15 calendar days after funding. For CDs opened by phone, accounts must be funded within 10 business days of application, and funds may not be withdrawn for 15 calendar days after funding. Deposits at FDIC-insured institutions are insured up to at least $250,000 per depositor. Please visit **www.fdic.gov**   for current FDIC insurance limits.

2 Please visit **www.fdic.gov**   for current FDIC insurance limits.

3 **Click here for transactions limitations.**

4 Visit the **BMO Security Center** for details.

5 Message and data rates may apply. Contact your wireless carrier for details.

**Explore our services**

Checking Accounts

Savings Accounts

Credit Cards

Loans

Mortgages

Investing & Retirement

**Security Center**

How We Protect You

How to Protect Yourself

Report Fraud

Security Alerts

Security Learning Center

Security Tips

**Ways to Bank**

Overview

Digital Banking

Register for Digital Banking

Bank by Phone

Bank at Work Services

Make a One Time Payment for your Non-Real Estate Loan

Payment Assistance for Mortgage and Home Equity

 

**CUSTOMER SUPPORT**

**BRANCH AND ATM LOCATOR**

Disclosure

Privacy

Legal

Security

Site map

Careers

About Our Ads

Accessibility

Cookie Usage

About BMO

App Store is a service mark of Apple Inc. Apple and the Apple logo are trademarks of Apple Inc., registered in the U.S. and other countries.

Android, Google Play, and the Google Play logo are trademarks of Google Inc.

Banking products and services are subject to bank and credit approval and are provided in the United States by BMO Bank N.A. Member FDIC.

Notice to Customers

To help the government fight the funding of terrorism and money laundering activities, federal law (USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001) requires all financial organizations to obtain, verify and record information that identifies each person who opens an account. When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask you to provide a copy of your driver's license or other identifying documents. For each business or entity that opens an account, we will ask for your name, address and other information that will allow us to identify the entity. We may also ask you to provide a copy of your certificate of incorporation (or similar document) or other identifying documents. The information you provide in this form may be used to perform a credit check

and verify your identity by using internal sources and third party vendors. If the requested information is not provided within 30 calendar days, the account will be subject to closure.

Third party web sites may have privacy and security policies different from BMO. Links to other web sites do not imply the endorsement or approval of such web sites.

Please review the privacy and security policies of web sites reached through links from BMO web sites. This information is not intended to be tax or legal advice. This information cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. This information is being used to support the promotion or marketing of the planning strategies discussed herein. BMO Bank N.A. and its affiliates do not provide legal or tax advice to clients. You should review your particular circumstances with your independent legal and tax advisors.

# Exhibit B

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| U.S. BANCORP INVESTMENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 1:07-CV-00284 |
| | ) | |
| v. | ) | Honorable Wayne R. Andersen |
| | ) | |
| STEVEN CHRISTOPHER UROSEVICH and | ) | Magistrate Judge Nolan |
| CITIGROUP GLOBAL MARKETS INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR EXTRAORDINARY INJUNCTIVE RELIEF

Defendants Steven Urosevich and Citigroup Global Markets Inc. ("GGMI" or "Smith Barney"), by their attorneys, respectfully submit this Memorandum of Law in Opposition to Plaintiff U.S. Bancorp Investments, Inc.'s ("USBI") Motion for Temporary Restraining Order and for Preliminary Injunctive Relief.

## INTRODUCTION

After nearly two weeks to uncover evidence that Mr. Urosevich has either breached his contract or otherwise violated Illinois law, USBI has found nothing. USBI fails to present a single fact which establishes that Mr. Urosevich has done anything other than notify his clients that he has changed his professional affiliation -- something that is perfectly lawful and appropriate. As purported evidence of Mr. Urosevich's solicitations, USBI relies solely on the conclusory assertions of Mr. Castrogiovanni that Mr. Urosevich called two of his largest clients "to solicit their business." (Castrogiovanni Decl., ¶25.) Tellingly, Mr. Castrogiovanni's hearsay testimony provides no substantive facts of Mr. Urosevich's contact with these two clients that could provide any basis for claiming that Mr. Urosevich solicited them. Rather, the declaration

merely presents his conclusory argument that there was solicitation. Mr. Urosevich has not solicited his former USBI clients; he is simply informing them that he is no longer employed by USBI, and is now employed at Smith Barney -- something not prohibited under the Plaintiff's restrictive covenant, and something that Illinois law encourages.

The vast majority of the clients at issue here had no relationship with USBI -- let alone a "near permanent" relationship with Plaintiff USBI, a separate broker-dealer from U.S. Bank (the "Bank"). Indeed, no more than 10% of the revenues generated by Mr. Urosevich in the last five years came from clients who had a brokerage account with USBI prior to Mr. Urosevich working with the person. The Bank simply provided him with leads, and Mr. Urosevich got some of those leads to become brokerage clients of USBI before Mr. Urosevich developed the relationships through his own efforts. Significantly, USBI did not give him a preexisting client base to service.

Now that Mr. Urosevich has left USBI, those clients reasonably expect him at minimum to inform them of the material fact that the person advising them on their personal financial matters is now affiliated with another firm. That is all that Mr. Urosevich has done: he promptly provided change-of-employment information to his clients. That some of Mr. Urosevich's customers at USBI have chosen to transfer their accounts to Smith Barney should come as no surprise since he developed them into customers of USBI. These are clients whose relationship is primarily with Mr. Urosevich personally, not with the company.

USBI's sole purpose in seeking this injunction is to quell competition. Mr. Urosevich is already limited by his contract to informational contacts. An injunction can serve no other purpose than to completely tie Mr. Urosevich's hands while USBI continues to reach out to clients, unfairly tipping the scales of competition in favor of USBI. This injunction will not

preserve the status quo but alter it in favor of Plaintiff.  USBI's requested TRO should be denied because:

**USBI does not have a substantial probability of succeeding on the merits:**  The restrictive covenant in USBI's contract does not restrict Mr. Urosevich's right to notify his customers of his current whereabouts.   Rather, the restrictive covenant prohibits only "solicitation" of customers who became known to him through his work at USBI.  Mr. Urosevich has not solicited any of his clients to move to Smith Barney, even though the majority of them are people with whom he developed brokerage relationships through his own efforts.  He has simply contacted his clients to inform them of his new work address and phone number, a basic act of professional responsibility and courtesy. Nor have any trade secrets been misappropriated. The mere names of Mr. Urosevich's customers -- which is all that is at issue here -- are not "trade secrets."  Mr. Urosevich personally knows all of these people.  The pertinent customer names are ingrained in his memory, and the customers' contact information is freely available (and was retrieved in part) through the internet and other public sources.

**USBI cannot establish that it will suffer irreparable harm absent a TRO:**  Any purported harm to USBI is fully compensable through money damages in the parties' already-pending NASD arbitration.  In the securities industry, records must be maintained that identify revenue generated by each customer and each account *to the penny*.  Thus, any "damages" can be precisely ascertained.

**A TRO would disserve the public interest.**  In denying the TRO, the Court will serve the public interest by permitting public customers to choose their own broker in these turbulent financial markets.

- 3 -

## LAW AND ARGUMENT

USBI must establish four factors to obtain the extreme remedy of an injunction: (1) a substantial likelihood of success on the merits; (2) "irreparable injury" unless the injunction issues; (3) proof that the threatened injury outweighs whatever damage the proposed injunction may cause Defendants; and (4) proof that the injunction would not be adverse to the public interest. *MacDonald v. Chicago Park District*, 132 F.3d 355, 357 (7th Cir. 1997); *Audio Properties v. Kovach*, 655 N.E.2d 1034, 1036 (1st Dist. 1995). A contractual stipulation to injunctive relief is unenforceable because "[i]t is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement." *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). Because an injunction restricting employment "is such an extraordinary remedy," USBI must set forth specific facts to support each element of this test. "Information and belief," speculation, opinions, or other conclusory allegations are insufficient to support a claim for injunctive relief. *Wilson v. Wilson*, 577 N.E.2d 1323, 1331 (1st Dist. 1991) ("Injunctive relief is so extraordinary that allegations of mere opinion, conclusion, or belief are not sufficient."). USBI fails to carry its burden of proof.

## I. USBI Cannot Demonstrate A Substantial Likelihood Of Success On The Merits.

### A. A Change-Of-Employment Announcement Is Not A Prohibited "Solicitation" Under The USBI Agreement.

Illinois courts abhor restrictive covenants in employment contracts and subject them to strict scrutiny because they are "repugnant to the public policy encouraging an open and competitive workplace." *Roberge v. Qualitek Int'l, Inc.,* No. 01 C 5509, 2002 WL 109360 at *4 (N.D. Ill. Jan. 28, 2002). In construing such contracts, judges in this district have repeatedly upheld securities brokers' rights to make informational contacts -- both oral and written -- with their clients regarding a change in employment. Oral informational contacts, like written

- 4 -

informational contacts, are not solicitations because it is the **content** of the communication that matters, not the method of the communication. Indeed, as the following cases demonstrate, courts in the Northern District repeatedly recognize that such informational contacts with clients do not run afoul of restrictive covenants nor can such contacts be enjoined because that would not protect any legitimate interest of a securities firm charged with the duty of providing full disclosure to public customers.

Glaringly absent from USBI's Memorandum is the plethora of cases from this district squarely addressing announcements in the context of brokers changing brokerage firms. Here is what the judges in this district have said on the issue.

Chief Judge Holderman, *Merrill Lynch v. Oblon,* No. 99 C 5968 at 10-12 (N.D. Ill. Sept. 10, 1999) (Ex. B).

> Based on that fact, the announcement of the broker that the broker has gone to Salomon Smith Barney, providing the phone number and other information ... it is my ruling that *that type of contact is not for the purpose of inviting, encouraging, or requesting any account to transfer from Merrill Lynch, or to open a new account at Salomon Smith Barney*, or to otherwise have the customer of Merrill Lynch discontinue its patronage from Merrill Lynch, or its business relationship with Merrill Lynch.
>
> The notice is for the purpose of informing the customer that the broker with whom the customer had been working at Merrill Lynch has moved to Salomon Smith Barney, and since it's for the purpose of informing, and since informing is not one of the restricted purposes in the Merrill Lynch financial consultant employment agreement, I believe that type of contact is not a violation of that employment agreement by the defendants.

Chief Judge Holderman held in *Merrill Lynch v. Pinzker,* No. 98 C 7979 at 20-21 (N.D. Ill. Dec. 11, 1998), (attached hereto as Ex. C).

> [The announcement] does not engage in any of the prohibited activity. It does not invite, it does not encourage, and it does not request any account to transfer from Merrill Lynch to [the broker] or his new employer, it does not invite, encourage or request any account to open a new account with [the broker] or his new employer, and it does not invite, encourage or request any account to otherwise discontinue its patronage and business relationship with Merrill Lynch. It does not do that.

> What this announcement articulates is that [the broker] has joined Salomon Smith Barney, and it would be up to the account to make the determination of what to do as a result of this information.

Chief Judge Holderman, *Merrill Lynch v. Pinzker,* No. 98 C 7979 at 2-3 (N.D. Ill. Dec. 15, 1998)

("Pinzker II") (Ex. D)

> The decision that I made on Friday . . . has not been changed by the testimony I have heard regarding [broker's] telephone contact with the few customers that he has been in telephone contact with.  I've heard no evidence that [broker] at any time during any of those phone conversations invited, encourage, or requested any of his customers to transfer from Merrill Lynch to his new employer, to open a new account with his new employer or himself, or to otherwise discontinue the customer's patronage and business relationships with Merrill Lynch.

Judge Gettleman, *Merrill Lynch v. Gurtin,* No. 99 C 406 at 40-41, (N.D. Ill. Jan. 27, 1999) (Ex.

E)

> I do not believe that the fact that the solicitations are oral, one on one, whether in person or by telephone, somehow taints them immeasurably as far as characterizing them as solicitations as opposed to some neutral announcement.

Magistrate Judge Rosemond, *Merrill Lynch v. O'Connor,* 194 F.R.D. 618, 619 (N.D. Ill. 2000):

> It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit [the broker] from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should his customers wish to contact him . . .

> Certainly, when the markets were as volatile as they were in the weeks surrounding the filing of Merrill Lynch's complaint, an informational announcement regarding [the broker's] new employment was essential.  ***Had Merrill Lynch been truly concerned about the welfare of its customers, it would have circulated such an announcement on its own.***

Judge Shadur,  *Merrill Lynch v. Hafner*, No. 01 C 427 at 5-7 (N.D. Ill. Jan. 24, 2001) (Ex.  F)

> [A]n informational communication about where the person who has been handling the account has gone or now is, is something that's separate from solicitation.  Indeed, to define 'solicitation' broadly in a way that would not give the freedom of contract as it should be given to the person who is the investor would I think strongly disserve the public interest, which is paramount in all of this stuff.

Allowing Mr. Urosevich to make informational contact with his customers is consistent not only with Illinois law, but with basic common sense and professional courtesy toward many dozens of public customers who are not before this Court. Indeed, for USBI to claim that Mr. Urosevich -- who has ties to his customers dating back several years -- cannot tell those customers merely that he has changed jobs "is in and of itself *indicia* of bad faith." *O'Connor*, 194 F.R.D. at 619.

Mr. Urosevich is a registered representative licensed to sell securities to public customers who have no stake in this case and want only to do business with the broker of their choice. Mr. Urosevich works in an industry closely regulated by various agencies and organizations such as the Securities Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the State of Illinois, and other securities regulatory bodies. Mr. Urosevich is charged with recognized legal, regulatory and industry obligations to his clients, especially the duty to disclose material information to them. He is professionally obligated to inform those clients with whom he worked closely regarding personal, intimate family financial matters that he has changed his place of employment so that those clients are able to contact him if they so choose.

USBI relies on *Merrill Lynch v. Cross*, No. 98 C 1435, 1988 WL 122780 (N.D. Ill. Mar. 13, 1998) and *Tomei v. Tomei*, 602 N.E.2d 23 (1st Dist. 1992), however, neither case supports USBI's position that Mr. Urosevich should be prohibited from informational contacts. As Chief Judge Holderman recognized in *Pinzker*, Judge Kocoras' opinion in *Cross* was based on the fact that the broker was providing account transfer forms to his clients, rather than sending mere announcements and it was that conduct which led Judge Kocoras to conclude that the broker was engaging in improper solicitations. *Pinzker*, Ex. C, at 7. Similarly, as Judge Shadur noted in

*Hafner,* the language cited by USBI in the *Tomei* decision cannot be read so broadly as to support USBI's position. *Hafner,* Ex. F at 11.

Here, there is no dispute that Mr. Urosevich has not unilaterally sent *any* account transfer forms to his clients or anything else other than the simple announcement card which is virtually identical to the announcement cards considered by Chief Judge Holderman, and Justices, Bucklo, Gettleman and Shadur in *Pinzker*, *Oblon, O'Connor, Gurtin* and *Hafner*.

### B.    The Restrictive Covenant Does Not Serve Any Legitimate Business Interest of USBI.

It is well settled under Illinois law that a legitimate business interest exists only in situations where the customer relationships are near permanent or where the former employee acquired trade secrets or other confidential information through his employment and subsequently tries to use it for his own benefit. *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 443 (2d Dist. 1997). Here, USBI cannot establish that either situation exists, and so its restrictive covenant is unenforceable.

### 1.    USBI does not have a "near-permanent" relationship with Mr. Urosevich's customers, as required under Illinois law.

As a matter of Illinois law, "an employer ordinarily has no protectable interest in its clients." *Audio Properties, Inc. v. Kovack*, 655 N.E.2d 1034, 1037 (1st Dist. 1995). Rather, a protectable interest exists only where the employer establishes "a near-permanent relationship with its customers…." *Trailer Leasing Co.*, 1996 WL 392135, at *1, *5. *See also,* Plaintiff's Memorandum at 13 (citing *Lawrence and Allen* for the proposition that "under Illinois law, a company has a protectible interest . . . in its customers when the customer relationships are near-permanent…."). Illinois courts are especially reluctant to find a "near-permanent" relationship where, as here, the customers at issue are cultivated through the employees' personal efforts. *See, e.g., Reinhardt Printing Co. v. Feld*, 490 N.E.2d 1302, 1308 (1st Dist. 1986) (former employee

testified that she developed all but approximately 17 of the 76 accounts she serviced by cold calls from sources such as the "Yellow Pages" and office building directories; appellate court held that plaintiff had no near-permanent relationship with these customers "whose business she was able to solicit not because of her association with plaintiff, but, rather, through her own efforts on plaintiff's behalf and in furtherance of her association with it."); *Springfield Rare Coins Galleries v. Mileham*, 620 N.E.2d 479, 490 (4th Dist. 1993) ("No [customer] testified that they would not have done business with [the employee] had he not been affiliated with [the former employer]").

USBI cannot establish that it has a "near-permanent" relationship with Mr. Urosevich's clients, for the vast majority of Mr. Urosevich's customer base consists largely of people who did not have pre-existing relationships with USBI. The fact that some of Mr. Urosevich's clients had a pre-existing Bank relationship does not establish that USBI has a "near-permanent" relationship to customers. The Bank, a non-party to this case, and bank relationships are not at issue here. Rather, the brokerage relationships are, and the Bank has no brokerage relationships. It was Mr. Urosevich who developed and cultivated these brokerage relationships that are separate and apart from any relationships the customers may have with the Bank. Mr. Urosevich cultivated these relationships not because of his association with USBI but through his own efforts on behalf of USBI. These are people who by and large opened USBI accounts because that is where Mr. Urosevich worked. USBI cannot argue in good faith that these customers are USBI's "near-permanent" relationships.

### 2. There are no "trade secrets" at issue here.

The mere identities of Mr. Urosevich's customers are not trade secrets. In Illinois, an employee need not blot from his memory the mere names of his former customers when he changes jobs. Courts apply this rule because "[a]ny other rule would force a departing employee

to perform a prefrontal lobotomy on himself or herself." *Fleming Sales Co. v. Bailey,* 611 F. Supp. 507, 514 (N.D. Ill. 1985). Accordingly, as a matter of Illinois law, a list or compilation of customer identities "will constitute confidential information ***only*** when the information has been ***developed by the employer*** over a number of years at great expense and kept under tight security." *Springfield Rare Coin Galleries*, 250 Ill. App. 3d 922, 930, 620 N.E.2d 479, 485 (emphasis in original). *See also A. J. Dralle, Inc. v. Air Technologies*, 627 N.E.2d 690, 697 (2d Dist. 1994); *Reinhardt Printing Co.*, 490 N.E.2d 1302, 1308. *Pinzker II,* Ex. D at 3 (finding no misappropriation of trade secrets where the only information taken by broker was names, addresses and phone numbers of his Merrill Lynch customers)**.**

USBI cannot possibly meet its trade secret burden. It cannot in good faith argue that it "developed" the information at issue here -- the mere names of Mr. Urosevich's customers -- or that the information is a "secret." Mr. Urosevich has worked with most of his customers for years and known many of them before he even became a securities broker. He ***knows*** who his customers are. As a matter of Illinois law, he need not (because he cannot) erase these people's names from his memory. There are simply no "trade secrets" at issue here.

### C.    <u>USBI Cannot Establish A Breach of Fiduciary Duty Claim.</u>

It is well settled under Illinois law that "while still working for an employer, employees may plan, form and outfit a competing corporation so long as they do not commence competition." *Cooper Linse Hallman Capital Mgmt., Inc. v. Hallman,* 856 N.E.2d 585, 589 (1st Dist. 2006). Here, Mr. Urosevich's act of electronically signing his U-4 to inform the NASD that he was leaving USBI a couple of days before his resignation is the type of preliminary competitive activity permissible under *Cooper Linse.*

Contrary to USBI's allegations, Mr. Urosevich did not send out announcement cards until after he had resigned from USBI and USBI offers no evidence to demonstrate otherwise. Indeed,

the announcement card USBI attaches as Exhibit H to its Memorandum which is postmarked January 5th is consistent with the fact that Smith Barney mailed the announcements on January 5th and in no way indicates that the cards were mailed *before* January 5th. While some clients may have received the cards the very next day, it is evident that others did not receive them until almost a week later. (*See* Ex. J to Pl.'s Mem., email dated January 11th stating that client "received a card in the mail today.") The unreliability of the postal system is yet, another reason why it is important for Mr. Urosevich to follow up with his clients to make sure they know where to reach him.

### D.    Smith Barney Is Protected By The Competitor's Privilege.

USBI's claims against Smith Barney for tortious interference with contract and prospective economic advantage also fail because Smith Barney as a competitor is absolutely privileged to recruit and compete with other brokerage firms, including for talented employees. Moreover, USBI cannot establish a claim for tortious interference because to satisfy that claim USBI would have to establish that the interference was "wrongful or unlawful." *Worrick v. Flora,* 272 N.E. 2d 708, 711 (3d Dist. 1971) ("court recognizes that a proper goal of competition may be the injury of a competitor and an injury so substantial as to cause the competitor to go out of business or to sustain great losses but generally speaking such damages result from an entirely proper act.") In determining whether an interference is "unlawful," the law recognizes the competitor's privilege set forth in Section 768 of the *Restatement (Second) of Torts* and Section 1 of *The Restatement of the Law (Third) on Unfair Competition, at comment a.*

Here, USBI has failed to meet its burden of showing an "improper" interference by Smith Barney. This is not a case where a party interfered with existing employment relations or client relations for the sole and unlawful purpose of invading the rights of another. Rather, Smith Barney acted to advance its own legitimate and competitive business interests by doing what is

an everyday occurrence in the securities industry:  competing with other brokerage firms for talented brokers and the business of brokerage clientele.

Smith Barney's competitive conduct and competitive purpose are proper; indeed, given the competitive motive, the conduct is shielded from liability on "interference" claims.  The propriety of Smith Barney's conduct is reflected in the commentary to the "General Principles" section of the *Restatement (Third) of Unfair Competition*:

> a.  <u>The freedom to compete</u>.  The freedom to engage in business and to compete for the patronage of prospective customers is a fundamental premise of the free enterprise system.  Competition in the marketing of goods and services creates incentives to offer quality products at reasonable prices and fosters the general welfare by promoting the efficient allocation of economic resources.  The freedom to compete necessarily contemplates the probability of harm to the commercial relations of other participants in the market. . . .
>
> The freedom to compete implies a right to induce prospective customers to do business with the actor rather than with the actor's competitors.  ***This Section permits a seller to seek to divert business not only from competitors generally, but also from a particular competitor.***

*Restatement (Third) of Unfair Competition* §1, cmt. a (emphases added).

Thus, Smith Barney has done nothing more than what it is allowed -- indeed, what it is encouraged -- to do as part of the free competition fostered by American society and its capitalist system.

## II.    USBI Has Not Established That It Will Suffer <u>Irreparable Injury If The Requested TRO Is Not Issued</u>.

In Illinois, injunctive relief is not proper where, as here, money damages are an adequate remedy.  *Allstate Amusement Co. of Illinois v. Pastinato*, 421 N.E.2d 374, 308-09 (1st Dist. 1981).  Money damages constitute adequate compensation absent a showing that it would be "impossible," rather than merely complicated, to ascertain the amount of damages.  *Wilson v. Wilson*, 577 N.E.2d 1323, 1333 (1st Dist. 1991).

Where, as is plainly the case here, any lost revenues to a plaintiff can be calculated with reasonable certainty, no injunctive relief is appropriate. *Wilson*, 577 N.E.2d at 1333, (citation omitted). Courts in Illinois and throughout the country have repeatedly applied this rule of law to similar "broker recruiting cases" and recognized that any purported harm to a brokerage firm caused by a departing broker is not irreparable and can be fully compensated by a damages award. For example, in *O'Connor* Judge Bucklo held that "[o]n irreparable harm, the amount of commissions generated from clients leaving Merrill Lynch to go with O'Connor to their new job can be readily ascertained." Ex. G. Similarly, in *Hafner* Judge Shadur found there was no inadequate remedy at law "because one thing we know about the brokerage situation is that the money aspect of it is defined. It's on a per-customer basis. The numbers of dollars involved are ascertainable. . . . the harm to Merrill Lynch is really measurable in terms of the lost commissions from those same customers." Ex. F at 12. As these and other courts recognize, the securities industry is unique because, as a matter of regulated, mandated practice, records must be kept and maintained regarding the revenue generated *to the penny* for each customer account:

> The securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from [the brokerage firm] is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants doing business with those customers that [the brokerage firm] considers its own can be traced precisely. Any loss [the brokerage firm] might suffer as a result of Defendants' departure is calculable.

*Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001) (denying motion for TRO against brokers who signed non-solicitation agreements because no showing of irreparable harm). Indeed, it is evident from Mr. Castrogiovanni's Affidavit that USBI knows precisely the amount of assets that were managed by Mr. Urosevich and will be able to calculate damages from lost commissions for any clients transferring to Smith Barney.

Moreover, any speculative uncertainties supposedly resulting from lost future referrals do not render damages incalculable for purposes of "irreparable injury" analysis. Nor do blind assertions of lost goodwill. *First of Michigan Corporation v. J.J.B. Hilliard, W.L. Lyons, Inc*., Ex. H at 62 (dissolving TRO) ("[E]very time there is a spat or dispute between business entities, there is always the possibility of loss of goodwill as a result of publicity and other things. So [a] loss of goodwill, I would submit, is not a very sound basis to premise injunctive relief on, particularly when one sees that this is a money business. This is a business that has calculable numbers. This is a business that in fact -- profession that in fact it can be quickly quantified"). If USBI has a legitimate claim, the proper remedy is money damages, not injunctive relief which adversely affects innocent third-parties.

## III.    The Balance Of Equities Requires Denial Of The Requested Injunction.

USBI also fails to carry its burden of proving an overriding harm to it, and that the equities in this case weigh in its favor. The entry of an injunction would not act to preserve the status quo. The status quo immediately preceding this litigation was that Mr. Urosevich's clients had the ability to exercise their freedom of choice to communicate and consult with him. Any type of restraint or limitation on the normal ability of clients to contact and consult with the financial advisor of their choice "has a disruptive impact on the status quo." *Merrill Lynch v. E.F. Hutton*, 403 F. Supp. at 344. Moreover, any such disruptions would create needless anxiety and hardship to third parties not before this Court, especially during these times of market tumult. The facts of this case do not warrant such a result. An injunction would imperil Mr. Urosevich's personal relationship with his customers and harm his professional reputation by making him appear to be untrustworthy or unconcerned about his clients.

The risk posed to Mr. Urosevich should USBI succeed is far greater than any risk to USBI. The commissions generated by Mr. Urosevich's clients are the sole means by which he

supports his family, but constitute only a small fraction of USBI's total revenues. This disparity of hardship is yet another independent reason to deny USBI's motion. *O'Connor*, Ex. G ("Even if there is the possibility of irreparable from the loss of customers to which Merrill Lynch claims ownership, the potential harm to O'Connor from a prolonged loss of all his customers would seem to be much greater than the potential loss to Merrill Lynch of customers who may or may not choose to deal with another Merrill Lynch broker.") *See also, Merrill Lynch v. de Liniere*, 572 F. Supp. 246, 249 (N.D. Ga. 1983) ("Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on [the broker] than on Merrill Lynch, that disparity of effect supports denial of an injunction.")

## IV. **The Injunction Request Is Contary To The Public's Interests.**

The public interest counsels against USBI's injunction request. As Judge Gettleman aptly noted:

> [I]t's just good common sense, you have to consider the public interest in competition and in relationships that are, I think, fairly uniquely personal in the brokerage business. I think that if any of us here were to call our broker and find that he had disappeared, we'd be pretty upset, even though the company may be as reputable and fine a company as Merrill Lynch. Our relationships with those companies is generally very personal through the broker.

*Gurtin*, Ex. E at 42-43. The NASD itself recognizes the primacy of investor choice and the public interest in barring any interference with a customer's effective exercise of his or her freedom of choice. *See* Ex. "I," NASD Notice To Members. Discussing the rule, the Chairman and CEO of the NASD explained, "[i]t is a fundamental right of an investor to choose with whom he or she does business, and the fact that a broker changes firms should not affect an investor's ability to continue to access his or her account and to do business with that broker."

Ex. J, NASD Press Release. Chief Judge Holderman also recognized this public interest in

*Pinzker,* Ex. C at 8-9:

> [W]ith regard to the public interest I believe there is a duty, and the public would
> be best served if the customers that were previously serviced by [the brokerage
> firm] . . . would be informed that [the broker] has left and where he has gone to, .
> . . the public interest would be best served by a financial institution such as
> Merrill Lynch, a financial institution such as Salomon Smith Barney, and
> individuals in the financial industry, such as [the brokers], providing full
> information to the customers regarding any individual that those customers
> previously had a relationship with.

## <u>CONCLUSION</u>

For each of the foregoing reasons, USBI's motion for extraordinary equitable relief

should be denied.

Dated:  January 18, 2007                                Respectfully submitted,

STEVEN UROSEVICH and CITIGROUP
GLOBAL MARKETS INC.


By: <u>s/Tiffany C. Woodie</u>
        One of Their Attorneys

Jerry M. Santangelo, Esq.
Tiffany C. Woodie, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Chicago, IL  60602
(312) 269-8000
(312) 269-1747 (fax)

## **CERTIFICATE OF SERVICE**

The undersigned attorney, Tiffany C. Woodie, certifies that on January 18, 2007, she filed the foregoing **Memorandum In Opposition To Plaintiff's Motion For Extraordinary Injunctive Relief** with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following parties:

Steven A. Levy, Esq., steven.levy@goldbergkohn.com
David E. Morrison, Esq., david.morrison@goldbergkohn.com

s/ Tiffany C. Woodie

NGEDOCS: 07239N.1437:1361471.3