IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIBANK, N.A., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHN A. MITCHELL, et al.,<br><br>    Defendants. | Case No. 24-cv-08224-CRB<br><br>**ORDER GRANTING APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

Plaintiffs Citibank, N.A. and Citigroup Global Markets bring this action against Defendants John Mitchell and Benjamin Carr, former Citi employees. Though an arbitration agreement between Citi and Defendants provides that the Financial Industry Regulatory Authority will ultimately resolve the merits of their dispute, Citi applies to this Court for a temporary restraining order to (1) enjoin Defendants from using, disclosing, or transmitting Citi's books, records, documents, or information pertaining to Citi, its clients, or its employees, and (2) require Defendants to return to Citi all records, documents, and information pertaining to Citi, its clients, and its employees. Defendants filed a response on Monday, November 25, 2024, and the Court held a hearing on Tuesday, November 26, 2024. The Court hereby **GRANTS** Citi's application for a temporary restraining order as to Mitchell and **DENIES** the application as to Carr.

**I.   BACKGROUND**

    **A.   Defendants' Employment with Citi**

Defendants John Mitchell and Benjamin Carr are former employees of Citi. Remak Decl. (dkt. 7-1) ¶ 3. At the time they left Citi, Mitchell's title was "Private Banker and Banker Team Lead," and Carr's was "Private Banker." Id. They both worked in the "Law

1   Firm Group of Citi Global Wealth at Work," with Carr working under Mitchell.  Id.

2   Mitchell serviced approximately 450 law firms and their Citi partners and associates, with

3   a total of nearly $500 million in assets.  Id. ¶ 4.  Carr serviced approximately 570 law firms

4   and their Citi partners and associates, with a total of over $150 million in assets.  Id. ¶ 5.

5       As a condition of his employment with Citi, Mitchell signed various documents

6   agreeing to maintain the confidentiality of Citi's and its clients' confidential information.

7   The offer letter that he signed stated:

> You also agree that during your employment, you may have access to or acquire confidential, customer, employee, competitive, and/or other business information that is unique and cannot be lawfully duplicated or easily acquired.  You understand and agree that you will have a continuing obligation not to use, publish or otherwise disclose such information either during or after your employment.

Id. Ex. C.  Similarly, Citi's Principles of Employment, which Mitchell also signed, stated:

> You must never use (except when necessary in your employment with us) nor disclose to anyone not affiliated with the Company any confidential or unpublished information you obtain as a result of your employment with us.  This applies both while you are employed with us and after that employment ends.  If you leave our employ, you may not retain or take with you any writing or other record that relates to the above.

Id.

   Carr signed the Principles of Employment as well.  Id. ¶ 30.  He also signed an Additional Terms Addendum, which stated:

> Except as other provided by applicable laws or regulations and/or … below, during your employment and after your employment with Citi terminates for any reason, you are required to keep confidential any personal, proprietary, confidential, and/or secret information of or regarding Citi that you may have access to or acquire during the course of your employment with Citi.

Id. Ex. D.  Finally, Carr signed a Joint Employment Agreement stating:

> You understand and agree that in the course of performing activities for your Employers, you will have access to, or be exposed to, confidential and proprietary information and trade secrets about your Employers' business, including information about their customers.  In this regard, you acknowledge that such information, including the list, or lists, of customers, in whatever form, … and any other personal or financial information

2

> pertaining to such customers … are valuable, special and unique assets of your Employers' businesses that they have expended an immeasurable amount of time and money to acquire.
>
> …
>
> You agree that upon termination of your employment with your Employers you will surrender to them all customer lists and all books, records, documents and other written information received in either paper or electronic form, copied, created or otherwise obtained by you which relate to your Employers' customers or businesses.

Id. Ex. E.

### B.      Defendants' Move to BMO

Mitchell and Carr gave notice of their resignation on July 19, 2024, as did fifteen other Citi employees. Id. ¶ 3. Mitchell's resignation became effective on October 2, 2024, and Carr's became effective on August 2, 2024. Id. ¶ 3. Both Mitchell and Carr are now employed by BMO Capital Markets Corp. Remak Decl. ¶ 7.

On July 17, 2024—two days before Defendants gave notice of their resignation—Carr ran five searches on Salesforce, Citi's customer-relation management platform. Id. ¶ 14. These searches, one of which was for "my clients," "include[ed] Citi client lists and [] Citi clients who had large cash balances" and would have displayed information including "the names of Citi clients and at a minimum, their cash balances." Id.[1] Carr had not recently accessed any of these records— at least, not since June 24, 2024. Id. ¶ 15. Carr declares that he accessed this client information simply "to continue servicing those individuals and fulfill my obligations to Citi." Carr Decl. (dkt. 21-1) ¶ 11. Carr also declares that he did not take, copy, or photograph any documents or files when he left Citi. Id. ¶¶ 12–15. For his part, so does Mitchell. Mitchell Decl. (dkt. 21-2) ¶¶ 7–12.

On November 4, 2024, Mitchell emailed one of his former Citi clients (whom the parties refer to as "Client A"):

---

[1] It is not actually clear what other information the searches that Carr ran gave him access to—that is, whether the searches simply provided Carr with a list of names or whether client information was included in those searches. See Remak Decl ¶ 14.

3

> I hope this finds you and the family doing well. I'm now at BMO Private Bank and was hoping to connect to discuss our strong Private Bank platform and relationship with [REDACTED]. Are you amenable to a call this week or next?
>
> I also wanted to share the deposit rates I can offer are better than Citi. I thought this was especially relevant given your high cash position. See below and let me know if you have any questions.

Id. Ex. A. Client A's multimillion-dollar certificate of deposit at Citi matured the same day that Mitchell sent this email, which included BMO's rates for certificates of deposit. Id. ¶ 10. Client A was purportedly one of the clients who would have appeared in at least two of the searches that Carr ran on July 17, 2024, id. ¶ 14, though Carr and Mitchell both declare that they never discussed Client A with each other—either while at Citi or after they moved to BMO. See Mitchell Decl. ¶¶ 29–31; Carr Decl. ¶¶ 18–19.

### C. Procedural History

On October 28, 2024 Citi initiated an arbitration before FINRA Dispute Resolution against Mitchell and several other former Citi employees for allegedly soliciting other Citi employees to leave Citi and join BMO. TRO Application (dkt. 7) at 1 n.1. Citi then brought this action against Defendants, asserting four causes of action: (1) breach of contract, (2) misappropriation of trade secrets and confidential information, (3) conversion, and (4) breach of fiduciary duty and duty of loyalty. Citi seeks a temporary restraining order that will enjoin Defendants from using, disclosing, or transmitting Citi's books, records, documents, or information pertaining to Citi, its clients, or its employees; and order Defendants to return to Citi all records, documents, and information pertaining to Citi, its clients, and its employees. Compl. (dkt. 1) at 18.[2] Citi also seeks expedited discovery to depose Defendants and inspect their electronic devices. TRO Application at 10–12.

---

[2] Even though Citi acknowledges that the merits of its action will ultimately be determined in arbitration, it is proper for it to seek preliminary injunctive relief in federal court "to preserve the status quo and the meaningfulness of the arbitration process." Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 981 (9th Cir. 2010); see also Remak Decl. Ex. B (Rule 13804 of FINRA's Code of Arbitration Procedure).

## II. TEMPORARY RESTRAINING ORDER

A temporary restraining order is an "extraordinary remedy" that is awarded only upon a clear showing that the party is entitled to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. Id. at 20. Alternatively, if the party seeking relief demonstrates that "the balance of hardships tips sharply in [its] favor," it need only show that "serious questions going to the merits were raised" and that the other two Winter elements are satisfied. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (emphasis added) (citation omitted). Either way, the party seeking relief must establish the Winter factors with facts; conclusory or speculative allegations are not enough. See Titaness Light Shop, LLC v. Sunlight Supply, Inc., 585 F. App'x 390, 391 (9th Cir. 2014); Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985).

### A. Likelihood of Success on the Merits

The Court begins with the "[l]ikelihood of success on the merits," which "is the most important Winter factor." Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted). The likelihood of success on even just one claim is sufficient as long as that claim would support the injunctive relief sought. See Dowl v. Williams, No. 13-cv-119-HRH, 2018 WL 2392498, at *1 (D. Alaska May 25, 2018) ("A plaintiff need not establish that he is likely to succeed on the merits of all his claims. A TRO or preliminary injunction may issue if a plaintiff can show he is likely to succeed on one claim and that he meets the other three requirements for injunctive relief." (emphasis in original) (citing League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 766 n.3 (9th Cir. 2014))). The Court finds that Citi has established a likelihood of success on the merits with respect to Mitchell, but not Carr.

Mitchell vigorously disputes whether Citi's client list constitutes a trade secret that is protected under California law. See TRO Opp. (dkt. 21) at 6–7, 10. In doing so, though,

he largely talks past Citi's actual allegations. He argues primarily that client "names and publicly available information that can be obtained through servicing an account is not a protectable trade secret." Id. at 7 (quoting Moss, Adams & Co. v. Shilling, 179 Cal. App. 3d 124, 128–30 (1986)).³ That begs the question, though, as to whether Citi's clients' financial holdings, investments, and cash positions are publicly available. And it fails to address Citi's actual argument—that "information about a client's specific financial holdings and investments" is a trade secret under California law. TRO Application at 5 (emphasis added). Citi's more precise framing would obviously apply to Mitchell, who contacted Client A, one of his former clients from Citi, and specifically referenced her "high cash position" based on a certificate of deposit that matured that same day.

The statutory text and case law supports Citi's position that, at the very least, certain nonpublic client information could qualify as a trade secret under this definition. California law defines a trade secret as "information" that (1) "[d]erives independent economic value … from not being generally known to the public" and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Nothing in the statute precludes the protected "information" to include client lists or client information. Further, to the Court's knowledge, the Ninth Circuit has never held that a client list cannot be a trade secret. Quite the contrary: Ninth Circuit precedent clarifies that the "most important consideration" in determining whether a customer list is a protected trade secret "is whether the information is readily accessible to a reasonably diligent competitor." Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1332 (9th Cir. 1980). Thus, "even if the 'general class' of customers is 'readily accessible' to others," a detailed customer list with specific customer information "may be a trade secret." Extreme Reach, Inc. v. Spotgenie Partners, LLC, No. CV 13-7563-DMG, 2013 WL 12081182, at *3 (C.D. Cal. Nov. 22, 2013) (quoting Hollingsworth Solderless Terminal Co., 622 F.2d at 1332–33); see also Chartwell Staffing Servs. Inc. v. Atl. Sols.

---

³ The Moss, Adams & Co. case was superseded by California's adoption of the Uniform Trade Secrets Act. See Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1527 (1997).

Grp. Inc., 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019) (finding the plaintiff's "customer list <u>and the information that accompanies the list</u>, such as the key contacts, mark up rates, and pay rates of each customer" to be a trade secret (emphasis added)); <u>Alliant Ins. Servs., Inc. v. Gaddy</u>, 159 Cal. App. 4th 1292, 1311 (2008) (finding information about customers' policy expiration dates constituted a trade secret).[4]

Citi establishes, and Defendants fail to rebut, that Mitchell could not have known that Client A's certificate of deposit had matured—and that she had a "high cash position"—based on public records alone. See Remak Decl. ¶¶ 23, 35–40. The Court concludes that such information is a protected trade secret. The Court therefore does not need to determine whether Citi's client list is also a protected trade secret, though there is ample authority that would support a conclusion that it is. See, e.g., <u>BakeMark, LLC v. Navarro</u>, No. LA CV21-2499 JAK, 2021 WL 2497934, at *8 (C.D. Cal. Apr. 24, 2021).

Mitchell also makes much of the fact that he did not retain or take with him any documents, writings, or records when he left his employment with Citi. See TRO Opp. at 6. But that is not dispositive to Citi's trade-secrets claim or even its breach-of-contract claim. California law protects against the misappropriation of trade secrets, which covers improper "use" of trade secrets and which does not require the retention of physical documents or records. Cal. Civ. Code § 3426.1(b). Furthermore, Mitchell contractually agreed not to "use" confidential information outside his employment with Citi. See Remak Decl. Exs. C, D. Whether he retained documents is therefore not dispositive to establish (or defeat) Citi's breach-of-contract claim. See <u>Fid. Brokerage Servs. LLC v. Rocine</u>, No. 17-cv-4993-PJH, 2017 WL 3917216, at *4–5 (N.D. Cal. Sept. 7, 2017) (concluding that former employee's solicitation of former clients, even if entirely from memory, is likely to constitute a breach of contract).

---

[4] At the hearing, Defendants pressed the argument that to be a trade secret, information must be "esoteric or unusual." The Court is not sure where this language comes from; it is not reflected in the statute or the case law. Indeed, a Westlaw search of the term "trade secret" in the same paragraph as the word "esoteric" yields only one result in the Ninth Circuit, and that case does not purport to impose "esoteric" as a legal standard for trade secrets. See <u>Intermedics, Inc. v. Ventritex, Inc.</u>, 822 F. Supp. 634, 638 (N.D. Cal. 1993).

Because Citi has shown that Mitchell likely misappropriated its trade secrets in the form of confidential client information (and likely breached at least some of his contractual obligations to Citi), the Court finds that there is a likelihood of success on the merits as to Mitchell. But Citi has not met its burden with respect to Carr. Citi has not established that Carr used or misappropriated any client lists, client information, or other trade secret while at BMO. Rather, Citi's entire case against Carr rests on the five searches that Carr performed before he left Citi—searches that, per his declaration, were run as part of fulfilling his "obligations to the firm and [his] clients." Carr Decl. ¶ 10. Citi tries to draw a link from Carr to Mitchell by pointing out that Client A's name showed up in two of Carr's searches. TRO Application at 2; Remak Decl. ¶¶ 14–16. But Citi does not provide any context to suggest that is mere coincidence; for example, the Court does not know how many other names appeared in Carr's searches, or whether those searches would have identified Client A's forthcoming high cash position. Without anything more, Citi's allegations against Carr are too speculative to support a temporary restraining order.[5]

### B. Irreparable Harm

A party seeking preliminary injunctive relief must "demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014). This includes "intangible injuries, such as damage to ongoing recruitment efforts and goodwill." Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991). To be even more precise, "an intention to make imminent or continued use of a trade secret … will almost always certainly show irreparable harm." Sun Distrib. Co. v. Corbett, No. 18-cv-2231-BAS, 2018 WL 4951966, at *7 (S.D. Cal. Oct. 12, 2018) (quoting Pac. Aerospace & Elec., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003)).

---

[5] Since Citi has not met the "threshold inquiry" of showing a likelihood of success on the merits, the Court "need not consider the other factors" as to Carr. Disney, 869 F.3d at 856.

Mitchell does not dispute these general principles. Rather, he argues that Citi fails to establish any nonspeculative risk of irreparable harm. To be sure, "a finding of reputational harm [like that asserted by Citi] may not be based on 'pronouncements that are grounded in platitudes rather than evidence.'" Titaness Light Shop, 585 F. App'x at 391 (cleaned up) (citation omitted). In Titaness, for example, the Ninth Circuit addressed an indoor-gardening-equipment manufacturer's assertions that its goodwill would be injured by a competitor (whose products had a similar name) marketing its products to marijuana growers. Id. The court found those assertions too speculative because the manufacturer never established that its customers were aware of the marketing, let alone that their behavior would be affected by it. Id.

Citi's allegations cross the threshold from speculative to factual. Unlike Titaness, Citi provides evidence that Mitchell actually contacted one of its clients after he started at BMO, and the client even forwarded Mitchell's email to Citi. Remak Decl. ¶¶ 10–11. This case is thus more similar to others in the Ninth Circuit where courts have found a likelihood of irreparable injury based on specific examples of defendants misusing client information. See, e.g., Fidelity Brokerage Services, 2017 WL 3917216, at *5 (citing Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001)).

### C.     Balance of the Equities

Citi argues that the balance of the equities supports an injunction because an injunction would secure Citi's goodwill and client relationships and deter other employees from misappropriating its trade secrets. TRO Application at 8. And Citi explains that Mitchell will be precluded only from breaching his contractual and common-law obligations to refrain from using Citi's confidential information. Id. The injunction that Citi seeks would not prevent Mitchell from "engaging in [his] chosen profession, working at BMO or any other firm, or even competing with Citi." Id.

That last point is critical—and it undermines Mitchell's primary argument on this prong. Mitchell attempts to rely on California's public policy, which disfavors restraints on worker mobility. TRO Opp. at 10 (citing D'sa v. Playhut, Inc., 85 Cal. App. 4th 927,

9

933 (2000), Golden v. Cal. Emergency Physicians Med. Grp., 896 F.3d 1018, 1023–26 (9th Cir. 2018), and Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal. App. 4th 853, 859 (1994), as standing for the proposition that California "has a 'strong public policy' against professional restraints and in favor of economic mobility"). But given the narrow scope of Citi's requested injunction, Mitchell's economic mobility would not be impacted in any meaningful way. He would merely be barred from using Citi's confidential client information—which he had "no right to use in the first place"—in his subsequent employment. See Vinyl Interactive, LLC v. Guarino, No. C 09-987 CW, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009).

As an alternative reason for finding that the equities weigh against Citi, Mitchell cherry-picks language from a brief Citi filed in other litigation in 2007 where Citi asserted that customer names are not a trade secret. Id.; Salmon-Smith Decl. (dkt. 21-3) Ex B (Citi brief in U.S. Bancorp Investments, Inc. v. Urosevich, No. 07-CV-284). Mitchell argues that, based on this 15-year-old brief, Citi should be judicially estopped from raising its trade-secrets claim here.

That argument is plainly wrong. First, as the Court has already explained, Citi's trade secrets claim survives due to Mitchell's use of confidential client information (Client A's "high cash position" based on the timing of CDs), not on client names alone. Citi did not argue in its Urosevich brief that confidential client information is not a trade secret. Second, the doctrine of judicial estoppel precludes a party from taking inconsistent positions to "play[] fast and loose with the courts"—for instance, by taking one position in federal court and one in state court to manufacture a procedural bar for habeas petitioners. Whaley v. Belleque, 520 F.3d 997, 1002 (9th Cir. 2008). It does not require a party to show unwavering fidelity to its positions in earlier, wholly unrelated litigation.

The balance of the equities therefore weighs in favor of an injunction.

D.   **Public Policy**

Citi correctly observes that "the only public interest at issue in this case is that of enforcing reasonable contracts and protecting a business's interest in its development."

TRO Application at 9. As the Court has already explained, California's public policy in favor of worker mobility is not implicated by Citi's desired injunction. And to the extent there is a public policy regarding the enforcement of contracts, it supports an injunction. See Henry Schein, Inc. v. Cook, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) ("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer."); Bank of Am., N.A. v. Lee, No. CV 08-5546 CAS, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) ("While California has a strong public policy in favor of competition, this interest yields to California's interest in protecting a company's trade secrets.").

\* \* \*

Citi has established all four Winter prongs as to Mitchell, so the Court **GRANTS** its request for a temporary restraining order against him.

### III.    EXPEDITED DISCOVERY

Pursuant to Federal Rule of Civil Procedure 26(d)(1), the Court has the authority to order expedited discovery—that is, discovery that takes place before the parties have conferred regarding the scope of discovery. The party seeking expedited discovery must show that there is good cause to depart from the usual discovery process. See Am. LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009); Robinson v. Carson, No. CV 20-8752 JFW, 2020 WL 11613844, at *1 (C.D. Cal. Oct. 22, 2020). The Court considers factors such as the breadth of the requested discovery, the purpose for the requested discovery, the burden on the defendants, and how far in advance of typical discovery the request was made. Davis, 673 F. Supp. 2d at 1067. District courts in the Ninth Circuit regularly permit expedited discovery in cases that, like this one, implicate claims of improper use of confidential information or trade secrets. See, e.g., Comet Techs. U.S. of Am., Inc. v. Beuerman, No. 18-CV-1441-LHK, 2018 WL 1990226, at *7 (N.D. Cal. Mar. 15, 2018) ("Quickly determining what information Defendant removed from Plaintiff, and whether and how Plaintiff's information is being used by Plaintiff's competitors is essential in order to minimize any harm to Plaintiff's competitive

11

position."); Miloedu, Inc. v. James, No. 21-cv-9261-JST, 2021 WL 6072821, at *4 (N.D. Cal. Dec. 23, 2021) (same).

As part of the expedited discovery that it seeks, Citi would like to "depose Defendants, inspect Defendants' personal and business computers and electronic devices, and issue Subpoenas Duces Tecum to Defendants' current employer, BMO Wealth Management and BMO Capital Markets Corp." [Proposed] Order Granting Application for Expedited Discovery (dkt. 7-6) at 3. Citi also requests that Defendants "identify any and all electronic devices that have at any times been used to store, access or transmit Citi's trade secret, confidential or proprietary information and submit such electronic devices to a vendor of Citi's choosing at Citi's expense for a forensic examination." Id. To the extent that these discovery requests are targeted at Defendants, rather than their current employer, the Court finds Citi's motion for expedited discovery to be appropriately narrow in scope. See Comet Technologies, 2018 WL 1990226, at *7 (collecting cases granting expedited discovery consisting of oral depositions of defendants and forensic computer examinations). But the Court does not consider it appropriate at this time for Citi to seek to issue subpoenas to BMO or otherwise seek discovery from BMO. The Court therefore **GRANTS IN PART** Citi's motion for expedited discovery.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Citi's motion for a temporary restraining order against Mitchell. It is ordered that:

> 1. Mitchell is hereby enjoined from using, disclosing, or transmitting for any purpose Citi's books, records, documents, and/or information pertaining to Citi, Citi's clients, and/or Citi's employees.
>
> 2. Mitchell, his agents, employees, partners, and any others acting in concert with him or on his behalf, or any other individual or entity having actual notice of the temporary restraining order by personal service or otherwise, are further ordered to return to Citi or its counsel all records, documents, and/or information in whatever form (whether original, copied, computerized, or handwritten) pertaining to Citi, Citi's clients, and/or Citi's employees, within 24 hours of notice to Defendants or their counsel of the terms of this Order.

> 3. The parties are directed to proceed with arbitration in accordance with Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.

This Order shall remain in full force and effect for fourteen days. Fed. R. Civ. P. 65(b)(2). Unless extended by further court order, it shall expire on December 11, 2024 at 5:00 p.m.

Citi shall post a security bond of $5,000 no later than November 29, 2024.

The Court also **GRANTS** Citi's motion for expedited discovery as to the following:

> 1. Oral depositions of Defendants;
>
> 2. Inspections of Defendants' personal and business computers and electronic devices;
>
> 3. A subpoena requiring Defendants to identify any and all electronic devices that have at any times been used to store, access or transmit Citi's trade secret, confidential or proprietary information; and
>
> 4. Forensic computer examination of any electronic devices identified in (3).

A hearing on the preliminary injunction is set for 10:00 a.m. on Friday, December 13, 2024. The Court sets the following briefing schedule:

- Citi's motion for a preliminary injunction is due by 11:59 p.m. on Friday, December 6, 2024.
- Defendants' response is due by 12:00 p.m. on Tuesday, December 10, 2024.
- Citi's reply, if any, is due by 11:59 p.m. on Wednesday, December 11, 2024.

**IT IS SO ORDERED.**

Dated: November 26, 2024

CHARLES R. BREYER
United States District Judge