Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
CITIBANK, N.A., et al.,        )
                               )
          Plaintiffs,          )
                               )
  VS.                          )   NO. C 24-08224-CRB
                               )
JOHN A. MITCHELL and BENJAMIN  )
C. CARR,                       )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Tuesday, November 26, 2024

**TRANSCRIPT OF REMOTE VIDEO PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom videoconference.)

For Plaintiffs:

> PADUANO & WEINTRAUB LLP
> 1251 Avenue of the Americas
> Ninth Floor
> New York, New York 10020
> BY:  **LEONARD WEINTRAUB, ATTORNEY AT LAW**
>
> NUKK-FREEMAN & CERRA, P.C.
> 1230 Columbia Street - Suite 860
> San Diego, California 92101
> BY:  **STACY L. FODE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                       Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Defendants:

3                              FAEGRE DRINKER BIDDLE & REATH LLP
                               Four Embarcadero Center
                               27th Floor

4                              San Francisco, California 94111
                          BY:  **PAUL J. RIEHLE, ATTORNEY AT LAW**

5

6                              FAEGRE DRINKER BIDDLE & REATH LLP
                               1177 Avenue of the Americas
                               41st Floor

7                              New York, New York 10036
                          BY:  **TRACEY SALMON-SMITH, ATTORNEY AT LAW**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Tuesday - November 26, 2024**</u>                    <u>**1:08 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Civil Action C 24-8224, Citibank, |
| 5 | et al. versus Mitchell, et al. |
| 6 | Counsel, please state your appearances for the record. |
| 7 | **MS. FODE:**  Good afternoon, Your Honor.  Stacy Fode |
| 8 | appearing on behalf of plaintiffs. |
| 9 | **MR. WEINTRAUB:**  And Leonard Weintraub of |
| 10 | Paduano & Weintraub, also on behalf of plaintiffs. |
| 11 | And we appreciate Your Honor for the courtesy of being |
| 12 | permitted to appear *pro hac vice*. |
| 13 | **THE COURT:**  Sure. |
| 14 | **MR. RIEHLE:**  Good afternoon, Your Honor.  Paul Riehle |
| 15 | of Faegre Drinker representing the two defendants John Mitchell |
| 16 | and Benjamin Carr. |
| 17 | **MR. SALMON-SMITH:**  Good afternoon, Your Honor.  Tracey |
| 18 | Salmon-Smith of Faegre Drinker as well, and I also represent |
| 19 | the defendants. |
| 20 | And thank you, Your Honor, for allowing me to be admitted |
| 21 | *pro hac vice*. |
| 22 | **THE COURT:**  Of course.  Well, is that it? |
| 23 | Oh, something is happening here.  My screen is acting up. |
| 24 | **THE CLERK:**  We can see you.  You can't see us? |
| 25 | **THE COURT:**  The Dow is up 2.8.  That's not where |

```
 1    I'm -- okay.
 2            THE CLERK:  Do you have -- okay?
 3            THE COURT:  It's moving all around.  Wait one minute.
 4    I now have MSNBC okay.
 5            THE CLERK:  Can you drop it down?
 6            THE COURT:  Well, now, I think we're -- and we have
 7    the court stenographer?
 8            THE CLERK:  Yes.  Ruth is on with us as well.
 9            THE COURT:  This matter is on for temporary
10    restraining order, and -- yeah, I'm okay.  Thank you.
11        And I read the papers.  I did have a question that -- I'm
12    not quite sure I understand the defendants' position.
13        While they maintain that such things as the identity of
14    customers would not be a trade secret because it's known in a
15    public way, I didn't think that was really the gravamen of the
16    complaint.  I thought that what the -- what the plaintiffs were
17    saying was that information as to the financial condition or
18    securities holdings, I guess, in this case, CDs, that would be
19    protected material within -- as a trade secret; and I thought
20    that's the argument.
21        Now, is that not the amount or may I ask Mr. Weintraub
22    or -- is that your argument?
23            MR. WEINTRAUB:  That is our position, Your Honor.
24            THE COURT:  Yeah.  So why -- why would the CDs be
25    publicly known or not trade secrets?
```

1              **MR. RIEHLE:**  Your Honor, Paul Riehle again for the

2    defendants.

3              **THE COURT:**  Yeah.

4              **MR. RIEHLE:**  Two things:  We need to separate out the

5    two different individuals.  We have a TRO being sought against

6    Mr. Mitchell and Mr. Carr.  I'll speak to Mr. Carr very

7    briefly.  He's not involved in any of that.  He didn't download

8    any anything.  He didn't give Mr. Mitchell anything.  So the CD

9    issue does not involve Mr. Carr.

10       So, then, let's talk about Mr. Mitchell.  The fact that

11   Mr. Mitchell has knowledge that a client -- former client had

12   CDs is really -- can't be a trade secret, Your Honor, and

13   something that he had personal knowledge of, that he took over.

14   I mean -- and I would --

15             **THE COURT:**  Tell me why it's not a trade secret.

16             **MR. RIEHLE:**  Well, it's -- let me direct the Court

17   with a quote from the *Moss Adams* case where they said that

18   information derived from personally servicing an account is not

19   a trade secret.  The court said:  Equity has no power to compel

20   a man who changes employers to wipe clean the slate of his --

21   of his memory.

22       And I think that's appropriate here, Your Honor, because

23   the fact -- the fact that there -- and a person knows that a

24   client, four months ago, had a -- had a CD and then sends

25   non- -- you know, sends public information that can't --

1    that -- about CDs, using CDs Citi's publicly traded

2    information, that just strikes me as not something that rises

3    to the level of a trade secret, that something --

4            **THE COURT:**  Why doesn't it?  Why doesn't it?

5        I mean, it's one thing just to keep saying it; and it's

6    another thing to have some principled basis.  If you're saying

7    whatever information he gleaned in his employment with

8    Citibank, by virtue of the fact that he was servicing

9    accounts -- that is to say, he was the salesperson who advised

10   and serviced people who made deposits with the bank, so

11   anything he learned during that course of employment, is not a

12   trade secret.

13       Is that your position?

14       Anything.  He learned the financial situation of a client.

15   He learned the details.  He learned that he had a CD.  He

16   learned when the CD was -- was -- was maturing.  He learned all

17   of those things -- and plus, many, many other things.

18       And you're saying:  No, no.  That's not a trade secret.

19   Everything he learned in the course of his employment is not a

20   trade secret.

21       Is that -- is there a case that says that?

22           **MR. RIEHLE:**  I can imagine, Your Honor, that if

23   someone learned of a -- a scientific experimentation that was

24   esoteric and took that to a competitor and he knew -- had that

25   knowledge and he used that knowledge at a competitor, that

1  might be a trade secret.  But here we're, it's a simple fact of

2  knowing that someone had a cash position in -- in a CD, that

3  doesn't -- that doesn't rise to the level of something that's

4  so esoteric and unusual.

5          **THE COURT:**  Well, I don't know "esoteric."  I mean,

6  these are all words that I don't have any -- I'm not quite sure

7  what the legal meaning of "esoteric" is.

8          Let's say I work for a drug company.  And there's a

9  patient out there that uses a very rare drug, X, that my

10 company -- that my company manufactures.  And it's a secret;

11 it's his medical condition.  He doesn't want it to be known.

12 And I go from company -- Pharmaceutical Company A to

13 Pharmaceutical B, under the same strictures that one goes from

14 Bank 1 to Bank 2.  Okay?  So it's the same thing.

15         Could I then phone the patient and say:  You know, you've

16 been paying X-dollars for this drug.  My new company will give

17 you that drug for $4 -- or X-minus-Y.

18         Now, that's all secret; that is to say, it's not publicly

19 known the person uses this drug.  It's not publicly known he

20 has a condition.  It's not publicly known what he -- what his

21 habits are or his practices with respect to acquiring drugs.

22 It's not publicly known what he needs.  All of those -- all

23 that information is in the salesperson's head.

24         And you're saying:  No, that's not protected.  And I don't

25 know if -- I'd like to see a case -- because obviously, it's

1   not -- I mean, the simple case is if you take Formula 1 from

2   Company A and give it to Company B, we're not talking about

3   that.

4       We're talking about information gained that was not

5   public -- not public -- in the course of his employment and

6   then utilizing that information.  So anyway your argument is,

7   as I understand it, it's simply not protected.

8           MR. RIEHLE:  Your Honor, I would say, you know, your

9   example is -- it comports with one of the cases, for example,

10  when there was a credit insurance company -- I think it's

11  called American Credit -- in plaintiffs' papers, where only

12  6.5 percent of the possible people who could use credit, this

13  credit insurance, actually had it.  So it was a very rare

14  instance where you actually had that information.  So that was

15  unusual.

16      The fact that a lawyer might have a cash position in a CD,

17  that's not so unusual, Your Honor.  That's not so esoteric.

18  And it -- I guess, that's my --

19          THE COURT:  That's not so esoteric and unusual.

20          MR. RIEHLE:  Yeah.  Yeah.

21          THE COURT:  Let's move on to just the second point --

22          MR. RIEHLE:  Sure.

23          THE COURT:  -- dealing with your client, not the

24  codefendant.  I'll get to the codefendant.

25          MR. RIEHLE:  I have both defendants, Your Honor, but

1  on this --

2                  (Unreportable crosstalk.)

3         **THE COURT:**  Okay.  But I'm talking about the person.

4     Is it your position that he did not utilize this

5  information; that is to say, he did not solicit or invite the

6  customer to look at the competitive rate?

7     Is that your position?

8     In other words, your position is it's not a trade secret.

9  Is it also your position that he didn't utilize that

10  information?

11        **MR. RIEHLE:**  I'm not -- that's a good question

12  Your Honor.

13     Did he utilize --

14        **THE COURT:**  Yeah.

15        **MR. RIEHLE:**  -- confidential information?  I don't

16  think he used --

17        **THE COURT:**  Look.  You may argue it's not --

18        **MR. RIEHLE:**  -- information that --

19        **THE COURT:**  -- confidential.  I'm not arguing.

20     I'm saying the information.  Did -- did he utilize the

21  information?

22        **MR. RIEHLE:**  Did he -- did he utilize information that

23  the client had a CD?

24        **THE COURT:**  That was maturing at a particular time.

25        **MR. RIEHLE:**  I don't know that he used the information

1    that it was maturing at a particular time.  At a general time,

2    I think, probably is more accurate.

3        **THE COURT:**  General time.

4      Did he use it?

5        **MR. RIEHLE:**  At some level, I suppose -- I suspect he

6    did, Your Honor.

7        **THE COURT:**  Okay.  All right.  Unlike the other --

8    unlike the codefendant.

9        **MR. RIEHLE:**  Correct.  He did not do anything.

10        **THE COURT:**  All right.  Okay.

11      So now I think I have to go back to Mr. Weintraub for one

12    second -- respond to it and ask the same questions as to this

13    defendant, and then we'll get to the other defendant.

14        **MR. WEINTRAUB:**  So I'm sorry, Your Honor.  What was

15    the question concerning Mr. Mitchell?

16        **THE COURT:**  Well, the question to Mr. Mitchell is,

17    opposing counsel takes the position that this kind of

18    information isn't confidential because it's not so esoteric

19    that it would fall within a protected trade secret.

20        **MR. WEINTRAUB:**  All right.  So sure.  I'll -- so, one,

21    we can describe it and give it all kinds of characteristics,

22    but let's acknowledge:  What is the information?  It's that a

23    particular client had a multi-million -- it's not, as

24    Mr. Riehle, said, "Oh, everyone has CDs.  Everyone has money in

25    the bank, even if it's $2."

1        This is a client who had a multimillion-dollar CD, so that

2   would put them in the -- in the not -- non-typical individual.

3   This is -- and two, he obviously knew the Citi rate, which is

4   not public; and he knew the exact date.

5        And he -- that's one thing that Mr. Mitchell does not

6   address in their papers.  He doesn't say how it came to be that

7   this -- this -- that he just happened to send this e-mail on

8   the very day that this multimillion-dollar CD was coming due,

9   and the client could have rolled it over to Citi, or the client

10  could have been convinced to give it to Mr. Mitchell at Bank of

11  Montreal at a better rate.

12       So those are the things that are -- are the real facts on

13  the ground.  And we believe that type of information and the --

14  you know, they submitted to their papers, Citi's published

15  rates.  You know, that's true Citi has published rates.  But

16  the -- they do not allege, because they can't, that the rate

17  that this particular client got is public, because it's not.

18       They had a particular rate that Mr. Mitchell, apparently,

19  knew to undercut that rate.  So it's not as if he's saying:

20  Hey, I knew you bought your drug at the published rate of X.  I

21  could sell it to you at our published rate, which is Y, which

22  is cheaper.

23       He does not say in his papers that -- that he was aware

24  that the client had a publicly filed rate.  So the rate -- that

25  information that is public is, yeah, if you walk into a bank

1    and have a hundred dollars and want to buy a CD, that's

2    probably what you're going to get.  If you have a

3    multimillion-dollar, you know, check that you're willing to

4    deposit, you're going to be able to negotiate the rate, which

5    is what this client did.

6        So this client's rate is not public.  The fact that they

7    had a multimillion-dollar CD coming due on a particular date,

8    none of that is public and nothing in their papers -- and as

9    you said, Your Honor, there are no cases that say, "Just

10   because you memorized it, it makes it okay."  And that's just

11   not what the law is.

12       So we feel very strongly that this is not okay for

13   Mr. Mitchell to use.  And I think, you know, counsel has

14   acknowledged that the information was, in fact, used; and

15   that's why we're in court.

16       You know, we didn't -- you know, we commenced an

17   arbitration -- if I could just take one second, Your Honor,

18   with your indulgences.

19       We didn't sue everyone in -- we did file a lawsuit, an

20   arbitration, against numerous individuals.  There's only two

21   people identified in this lawsuit because these are the only

22   two people we're asking for a TRO against because these are the

23   people that we believe took and have been using Citi

24   confidential information, which is improper.

25           **THE COURT:**  Let me turn to the second person.  I guess

1    his name is Mr. Carr; is that right?

2            **MR. WEINTRAUB:**  Yes.

3            **THE COURT:**  Okay.  What is -- specifically as to

4    Mr. Carr, what is your contention that he -- his conduct

5    warrants injunctive -- and injunctive prohibition?

6            **MR. WEINTRAUB:**  Sure.  Mr. Carr conducted five -- a

7    minimum of five searches, less than 48 hours before he

8    resigned, specifically asking about, you know, his clients and

9    also asking -- searching for specific cash balances for various

10   clients.

11       And there's no legitimate reason why, on the eve of his

12   departure, why he would need that information.  So he didn't --

13   he was not asked -- he was not searching:  Hey, Len Weintraub

14   or our client, Joe Smith -- oh, I want to see, because I'm

15   going to talk to him tomorrow or I'm having a farewell lunch

16   and I want to look -- we're talking about searches that

17   encompass dozens and dozens of clients.  And there's no

18   legitimate reason why he needed to do that.

19       And he, actually, you know, all he said was, "I did stuff

20   in the ordinary course."  His declaration does not address, at

21   all, why he would need to do this type of particularized search

22   48 hours before he left, nor does he acknowledge or address

23   that he looked up Client A's -- and accessed Client A's

24   information, a client he says -- because Mr. Remak's

25   declaration says, on two of -- at least two of the searches --

1   two of the five searches, it likely would have pulled up this

2   information about Client A and her balances.  He doesn't say,

3   "I never looked up Client A before I left."  He doesn't address

4   that.

5       So that's -- so -- so we think the evidence is quite

6   powerful, and we know circumstantial evidence can be just as

7   powerful, if not more convincing, than direct evidence.  We

8   think that there's no reason why he should have conducted these

9   both.

10      They both -- both Mr. Mitchell and Mr. Carr acknowledged

11  they both serviced this client; they say there was a handoff.

12  They both serviced the same law firm.  And now they're

13  quibbling that, "Well, I was the primary person responsible for

14  the Client A, and I turned that over to Mr. Mitchell in 2022,"

15  but they both serviced this client at various points in time.

16  They both serviced the same law firm that Client A worked at.

17  And we think it's compelling that -- and they do not explain

18  why Mr. Mitchell was doing this.

19      And that's why we're here, and we've added Mr. Mitchell --

20  Mr. Carr to the complaint.

21          **MR. RIEHLE:**  Your Honor -- I'm sorry.  I didn't mean

22  to interrupt.

23          **THE COURT:**  No, no, no.  I wanted to turn to you or

24  your colleague and find -- and have a discussion about

25  Mr. Carr.

1    I understand what they're saying, I mean --

2         **MR. RIEHLE:**  And they've said a lot of things that are

3    not in their papers.

4         **THE COURT:**  Well, no.  They're saying that they

5    accessed -- that Mr. Carr conducted a search two days before

6    the -- before his departure in which he had access to a number

7    of the clients and their balances.  That's what I -- that's

8    what I hear him saying.

9         And so -- and that there is no explanation of why somebody

10   leaving, having given notice and departing, and intending to go

11   to a new bank, would have accessed this information for

12   legitimate purposes, or purposes other than utilizing that

13   information -- which, again, is confidential -- or isn't, I

14   mean, that's your contention, it's not -- but assuming that it

15   is, there is no legitimate non- -- non-legitimate explanation

16   of why he would need that information in connection with his

17   doing business in his last two days at the --

18        **MR. SALMON-SMITH:**  Your Honor, may I address --

19        **THE COURT:**  You may address, of course.  Go right

20   ahead.

21        **MS. SALMON-SMITH:**  Thank you, Your Honor.

22        So with respect to Mr. Carr, as he said in his

23   declaration, that he -- that he had -- would access account

24   information.  So the day he gave notice is the day they cut off

25   his access.

1      So -- but before that, he uses the access to service his

2    clients.  And he didn't do anything wrong with that information

3    because there's no evidence that he downloaded it or copied it.

4      I'm sure that Citibank has run and done their forensic

5    analysis of his activity.  And some of the information that's

6    in Mr. Remark's -- -mak's declaration is on information and

7    belief.  They don't have any evidence that he did anything with

8    that information.

9      They are saying that he and Mr. Mitchell were servicing

10   that client.  Both of our clients have specifically said that

11   once Mr. Carr became a private banker, that he then had his own

12   clients and Mr. Mitchell had his own clients, and they were not

13   servicing the same client.

14     And Mr. Carr denies that he looked up any information

15   related to Client A; and, again, there's no evidence, there's

16   no forensics evidence that he did anything with those -- with

17   that information other than servicing his clients in the normal

18   course because as soon as he gave notice his access was cut

19   off.

20     And then, with respect to the -- with respect to the --

21   his activity, the papers that the plaintiffs have put forth are

22   trying to connect Mr. Carr because he's the one that they say

23   accessed the system; that somehow Mr. Carr accessed the system

24   and then gave the information to Mr. Mitchell.  And our clients

25   flat out deny those allegations in their declarations.

1          **MR. WEINTRAUB:**  If I could interject, Your Honor.

2      I don't believe that Mr. Carr's declaration says what

3  Ms. Salmon-Smith just represented to the Court.  He does not

4  address why he accessed Client A's information two days before

5  he left.

6          **MS. SALMON-SMITH:**  He said he didn't.

7          **MR. WEINTRAUB:**  No, he just says he didn't take it.

8  He says he did not take anything.  All he says is:  I continued

9  to fulfill my obligations to the firm and my clients, which

10  included servicing clients during the resignation period.

11  Anything I accessed was used in the servicing those clients to

12  fulfill my obligations.

13      And he says:  I didn't take anything.  I didn't print

14  anything.

15      He does not specifically address why he's accessing

16  Client A.

17          **THE COURT:**  Both defendants say they didn't take

18  something.  I mean -- and, I guess, what "take" means is take a

19  piece of paper or take something tangible.  They're not

20  saying -- I don't understand them to say they're not taking

21  information.

22      That's very effective.  That's very good.  I try to do

23  that --

24          **MR. WEINTRAUB:**  We're fuel efficient in New York.

25          **THE COURT:**  That's because you're -- you don't work

1  for the Government.  Yeah, because you work for the Government,

2  the lights go out, they stay out.

3      The -- this -- I understand in a sense, the operative word

4  is "take," but -- because you cannot take information.  But --

5  but it's been -- these discussions have demonstrated that you

6  can take what's in your mind.

7      I mean, that's -- and I think what your objection is:  Why

8  is he accessing this information?

9      He's putting it in his mind.  Maybe he's not writing it on

10  a piece of paper.  Maybe he's not taking a copy of the

11  information, but he is -- now, it's in his mind.  And does he

12  take confidential information, in his mind, and then utilize

13  it?

14      And the question, then, is:  Is it -- what evidence do you

15  have of his utilization?

16      If I understand your argument on -- on it's Mr. Carr --

17  who is the second one?  Carr; right?

18          **MR. WEINTRAUB:**  Carr and Mitchell.

19          **THE COURT:**  Pardon?

20          **MS. SALMON-SMITH:**  Carr is the second.

21          **MR. WEINTRAUB:**  Carr and Mitchell.

22          **THE COURT:**  Mr. Mitchell is the first one.  Mr. Carr

23  is the behind.

24          **MR. WEINTRAUB:**  Yes.

25          **THE COURT:**  Your argument about Mr. Carr, as I

1    understand it, is that -- that circumstantially, there is

2    circumstantial evidence that he is -- that he has this

3    confidential information, which was designed -- because there's

4    no other explanation -- to be in his mind so that he's able to

5    take it; and why would you take it if you're not going to

6    utilize it?

7        And therefore, the threat he presents is that he, now, has

8    a refreshed recollection or maybe a -- now a recollection as to

9    who these people are; and he gains that information under

10    circumstances that are in -- that is inconsistent with his

11    stated purpose, which is:  I just used it in the ordinary

12    course of business.

13        That's, I think --

14        **MR. WEINTRAUB:**  That's a fair summary of our position,

15    Your Honor.

16        **THE COURT:**  So I have a further question to ask which

17    is this -- and I know this isn't really one of factors, but it

18    always interests me, which is:  If I issue this injunction

19    which simply says, "You can't utilize this information that you

20    gained," what harm is caused to the defendants?

21        They're saying they're not doing it anyway.

22        I don't know whether Mr. Carr is saying he's not doing it.

23        Mr. Martinez [sic] doesn't quite say that.  He takes the

24    position that it's just not confidential.  So, putting

25    Mr. Martinez aside for the moment and talking about Mr. Carr,

```
 1   what's Mr. -- other than -- other than "He doesn't deserve to
 2   have an injunction placed against him" -- I got that -- I'm
 3   trying to figure out what harm is -- is --
 4            MS. SALMON-SMITH:  Your Honor --
 5            THE COURT:  -- arises out of the injunction,
 6   especially since I would give immediate discovery to determine
 7   what the facts are.
 8            MS. SALMON-SMITH:  Well, Your Honor, the harm is that
 9   Mr. Carr is working for a company, and now you have -- if you
10   have, you know, an injunction against him, then his current
11   clients, any potential clients, are going to sort of look askew
12   on that.  And we believe, at the end of the day, that it will
13   be found that he did nothing wrong; and yet he's being
14   tarnished with a potential restraining order related to
15   something that he doesn't have, and he didn't do.  And so --
16            THE COURT:  When you say, "he doesn't have," I don't
17   understand that argument.
18      I mean, he has the information.  Now, that he -- whatever
19   he did with it -- whatever he did with it is another -- is
20   another situation.
21      He said he did nothing with it.  That's what he said:  I
22   did nothing with it --
23            MS. SALMON-SMITH:  Right.
24            THE COURT:  -- I used it in the ordinary course of
25   working for Citibank, and I didn't do anything with it --
```

1          **MS. SALMON-SMITH:**  Right.

2          **THE COURT:**  -- that's what he says.

3          **MS. SALMON-SMITH:**  And then that was in July when

4   he -- you know, when he's accessing the systems before he left.

5   His last day was July 19th.  And then, we're now in November

6   of -- you know, several months later.  And, you know, somehow

7   he's at -- given this information to the -- to Mr. Mitchell so

8   that Mr. Mitchell can somehow use it later down the road.

9          So -- but I do think there is the harm.  And, also, I

10  still -- you know, I'm sure we're going to go back to this on

11  the trade secret part, because under the Uniform Trade Secret

12  Act, a trade secret is very narrowly defined to include,

13  information, including a formula, pattern, compilation,

14  program, device, method, technique, or process that derives

15  independent economic value, and we've laid that out in our

16  papers.

17         But the information that -- that Mr. -- that either of the

18  defendants would have accessed, and that they're showing as

19  being used in that -- in that e-mail in November, is not a

20  trade secret.

21         **THE COURT:**  Oh, well, Mr. Weintraub, do you want to

22  reply?

23         **MR. WEINTRAUB:**  Well, I think we're going to

24  whether -- I think the Court's question was:  Is there any harm

25  to defendants --

1       **THE COURT:**  But I don't expect you to address -- I

2   think, counsel has a point.

3       I mean, here is somebody who's in a new position, trying

4   to get clients and so forth; and just -- he certainly doesn't

5   want to have a restraining order against him unless there's a

6   probability -- some probability that he's done something wrong,

7   to which he said there is none.

8       So, I mean, I don't willy-nilly hand out injunctive relief

9   just because he may do something bad with this information.

10       He has the information, I understand that.  But, unlike

11   Mr. Mitchell, who clearly used or seemed to have used the

12   information, it's not -- it's not clear with respect to

13   Mr. Carr that he did anything after.

14       Now, my guess is you will take depositions and discover

15   whether he did anything with the information or not.  I mean,

16   it's -- you'll find out.  And if he did something with the

17   information, then -- then, that's another story.  If he didn't,

18   he didn't.

19       I mean, I can't go back and take 18 employees and put them

20   all under an injunction because they had -- they had

21   information.  That's -- that's --

22       **MR. WEINTRAUB:**  And we're not asking for that.

23       **THE COURT:**  But you're -- but there's a -- there is a

24   qualitative difference between what Mr. Mitchell did and what

25   Mr. Carr did.  And what Mr. Mitchell did was -- alleged -- it's

1    alleged that he -- that this information that he had, which

2    they claim is not a trade secret, was utilized by his new

3    employment something that, if it is a trade secret, would not

4    be permitted; would be a violation of the agreement.  Fine.

5         With respect to Mr. Carr it's -- it's -- it's -- does it

6    rise any -- it's a suspicion.  Does it arise out of -- to the

7    level of Mr. Martinez or is there -- or putting it another way

8    is there any evidence that he actually utilized the

9    information?

10        If, for example, Mr. Mitchell sent out five letters of

11   which one or two or five, could only have been gained by

12   Mr. Carr's telling Mr. Mitchell something, yeah, that would be

13   some evidence.

14        But I don't see that in the papers.  All I see is,

15   you know:  He did this two days before he left.  It's very

16   suspicious; and why would he have done it if it weren't his

17   intention.

18        And by the way, intention is one thing and action is

19   another thing.

20        What you intend to do and what you -- and what you do, or

21   what the likelihood is you do something is quite different from

22   an intention.  And that's -- I just think that -- I think they

23   have to be treated differently, and I think the facts justify a

24   different treatment.

25        Two other questions.  Well, do you want to respond to

1    whether or not -- I know it's a rehash, but Ms. Salmon-Smith

2    has said:  Here's the definition of trade secrets and this

3    doesn't fall within it.

4        **MR. WEINTRAUB:**  I don't think that's supported by the

5    case law.  I think the case law is very clear that client --

6    client lists and client information, to the extent they're not

7    public and to the extent that they're valuable, are protectable

8    as trade secrets.  And I think the cases are very clear about

9    that.

10        So I don't think that's really in dispute.  I think that's

11    just going back to the false premise that, "Well, it's all

12    publicly available, so" -- but the fact that information that's

13    still not publicly available, the fact that you can memorize

14    it, does not take it out of the realm of trade secret or

15    otherwise protectable information.

16        **THE COURT:**  So let me ask another question.

17        What -- I am prepared -- I'm going to grant an injunction

18    as to Mr. Martinez.  I want to take a look at the declarations

19    as to Mr. Carr.  So I -- I don't know whether I'm going to

20    include him.  As Leo Derocher said:  Maybe I'll include him

21    out.

22        I don't know yet.  I want to go back and look at the

23    papers.

24        But, you have to post a bond.

25        What is the reasonable bond in this matter?  I mean --

1          **MR. WEINTRAUB:**  We would propose $5,000.

2          **THE COURT:**  Yeah.  That's a reasonable bond.  There's

3    no --

4          **MR. RIEHLE:**  Your Honor, we sort of skipped over some

5    of the other requirements for injunctive relief.  And I'd like

6    to I'd like to address the irreparable harm issue, if I could.

7          **THE COURT:**  Yeah, yeah.  Sure.  Go right ahead.

8          **MR. RIEHLE:**  So, Your Honor, there hasn't been any

9    claim that Citibank has lost any clients.  They haven't claimed

10   that they -- all they have is a speculative, conclusory claim

11   of loss of good will.

12        And let's unpack that for a little bit.  The sole instance

13   they have is this instance of Mr. Mitchell sending an e-mail

14   about CD information to someone he had previously worked with.

15   It's -- just boggles the mind that that could result in a claim

16   for good will.

17        And, Your Honor, assuming that this is a wrongful act, and

18   assuming this a trade secret, and assuming there was

19   solicitation, and assuming something happened, this example

20   shows that there's a damage remedy easily available.

21        What would be the damage remedy?

22        Well, there's a CD.  If the CD had been lost from Citi to

23   BMO or Mr. Mitchell's company, then we can measure the damages

24   by the lost interest that Citi would have -- would have had.

25   So there's easily a damage remedy and there's no -- there's no

1    irreparable harm.

2        **MR. WEINTRAUB:**  Well, I think the courts are clear

3    that loss of clients and future business from those clients is

4    irreparable harm, because -- we don't disagree that you can

5    measure the lost profits with respect to a CD; but it's the

6    other business.

7        When a client leaves, you have no way to know how much

8    other business will that client give you over that time period,

9    how many friends and colleagues will that person refer to you;

10   and that becomes all speculative damages.  And that's why,

11   you know, courts, I think, generally consider a loss of a

12   client.

13       And I'm not aware of anyone who says, "You have to

14   actually chop town the cherry tree or -- you know, before you

15   can get the TRO."  I think, if it's likely to happen, and

16   someone is trying to do that, you can get an injunction from

17   doing that.

18       I don't think there's any case law that says you can't get

19   is a TRO unless someone has actually been harmed.  It's about

20   the likelihood of harm.  And if Mr. Mitchell is deemed to be

21   using our information and trying to persuade clients to move

22   based on that, that is sufficient to issue and that is why the

23   TRO is necessary.  Otherwise, we're accused of *laches*.  You

24   came into court after everybody left, and now you'll get your

25   money damage.

```
 1              THE COURT:  Let's be mindful here.  We're talking
 2     about a TRO, not a preliminary injunction.
 3              MR. WEINTRAUB:  Correct.
 4              THE COURT:  So I am going to grant the TRO.  I'm going
 5     to set a bond of $5,000.  I am going to grant discovery.
 6         And the TRO, by its terms, I think lasts -- what? --
 7     ten days?
 8              MR. WEINTRAUB:  I think it's ten business days.
 9              THE COURT:  Ten business days.  Okay.
10         So -- so I want to set, and I will in the papers, a date
11     for a preliminary junction.  But I want to -- you know, first
12     of all, we're dealing with the holidays.  And I want to -- I
13     want to accommodate -- we have counsel from New York.  I don't
14     know.  Are you in New York?
15              MR. WEINTRAUB:  I am in New York.
16              THE COURT:  Okay.  So, well, you probably want to
17     leave New York because it's -- you want to be here, in
18     California.
19              MR. WEINTRAUB:  It's cold here, Your Honor.
20              THE COURT:  It's freezing here, too; it's awful.
21         But I -- you'll have to work with my judicial -- my
22     courtroom deputy and pick a date if that date isn't convenient
23     and so forth.  And I can extend it for a limited period of time
24     for good cause.  In any event, good cause will be -- you know,
25     it's important for you to do some discovery immediately.  If
```

```
1    you don't -- if you're unable to do it, then I have to figure
2    out why.
3         On the other hand, I don't want to be so disruptive of
4    people's holiday schedules that they, you know, on
5    Thanksgiving, they're not with their family or they this or
6    that.  So let's -- we'll get real here.  This is not the crime
7    of the century.  This is, you know, a commercial dispute.  I'm
8    not saying it's not serious, but it's a commercial dispute
9    that -- that you want to act in a humane way with respect to
10   all the people affected, which includes lawyers, by the way;
11   and includes associates too.  You know, they're lawyers.
12        And so you-all work it out, is what I'm saying.  I will
13   issue something either today or tomorrow on this and --
14        MR. WEINTRAUB:  And we did propose our proposed
15   discovery.  So if -- I don't know if the Court has reviewed
16   those and is officially blessing it.
17        THE COURT:  I'll address that in my order.
18        MR. WEINTRAUB:  Okay.  Thank you, Your Honor.
19        MR. RIEHLE:  Your Honor, one issue about the discovery
20   and that is they -- Mr. Weintraub's declaration, he attaches
21   both a document request and a proposed subpoena to BMO.
22        But in the proposed order, they raised this potential, the
23   possibility, the idea of imaging computers and electronic
24   devices.  And, you know, there's no been showing that -- for
25   that sort of intrusive discovery.
```

1    We've issued litigation holds.  There's no reason that

2    something like imaging computers has to be done in this

3    instance.

4            THE COURT:  Okay.

5            MR. RIEHLE:  Or your phone or what not.  They contain

6    lots of personal information.

7        And I would point to the two cases in plaintiffs' papers

8    where the court denied that sort of discovery without some sort

9    of -- some further showing.  That would be the *Schein* case and

10   the *Wescom Financial Services* case.

11           THE COURT:  Well, let me just point out something.

12   I've learned one thing in 26 years:  A coverup is generally

13   worse than the crime itself, so -- and I'm not talking about

14   crime in a criminal way.  I'm just saying:  Whatever he did --

15   whatever these people did, they have to live with it.  The

16   worst thing they can do is cover it up in some way.  It just --

17   it will lead to all sorts of unintended consequences.

18       And I -- you know, I believe I'm dealing with people who

19   are -- first of all, I'm dealing with lawyers who will caution

20   clients on this issue and -- you know, and we can just deal

21   with it on that basis.

22       I'd like to take it one step at a time.  I thank you for

23   pointing that out.

24           MS. SALMON-SMITH:  Your Honor --

25           THE COURT:  Yes.

1    **MS. SALMON-SMITH:** I just would like some

2  clarification, because originally you had said that -- it

3  seemed that you were inclined to grant the TRO as to

4  Mr. Mitchell, and that you were going to review with respect to

5  Mr. Carr. So I was just trying to get a clarification that

6  what you're saying right now applies to Mr. Mitchell only.

7    **THE COURT:** Well, I don't know about the discovery. I

8  mean --

9    **MS. SALMON-SMITH:** Yeah.

10    **THE COURT:** Is the discovery limited.

11    **MS. SALMON-SMITH:** No, no, no. I'm talking about the

12  TRO.

13    **THE COURT:** Well, what I've said about the TRO is I'll

14  review whether or not I should include Mr. Carr in the TRO. I

15  haven't made up my mind yet. I have the arguments in mind.

16  They seem to be, in some respects, obviously, similarly

17  situated, in some respects differently situated.

18    **MS. SALMON-SMITH:** Okay. Thank you, Your Honor.

19    And then, just one last thing is that, with respect to

20  Mr. Mitchell, you know, issuing a TRO is still harmful to him

21  in a different way from Mr. Carr. So I just wanted to note

22  that for the record because, you know, he is -- he's working,

23  and this is going to -- is going to get out.

24    Plaintiffs' counsel has gone to the newspapers, or the

25  media, about filing the case, so I can imagine what's going to

1    happen once something is issued.  So there is harm to our

2    client.  So I just wanted to make a note for you.

3         **THE COURT:**  There's harm to every defendant.

4         **MS. SALMON-SMITH:**  Yes.

5         **THE COURT:**  I understand that.  But lawsuits are

6    public.  Counsel has a right to -- has a right to discuss

7    public litigation.  And, you know, that's -- that's not

8    something I control, unless it has some adverse impact on the

9    proceedings itself.

10        But I'm mindful of that.  I mean, people, you know, prefer

11   not to be sued, and a lawsuit does that; but we have a system,

12   and the system works a particular way.  And the question is:

13   Do the facts justify the relief that is being sought?

14        My view is the facts do justify.  The facts, that is the

15   allegations.  The evidence has been presented did justify an

16   injunction in this case.  And the scope of the injunction with

17   respect to the people who are affected by it, that's a matter I

18   want to give some further consideration to.

19        **MS. SALMON-SMITH:**  Thank you, Your Honor.

20        **MR. WEINTRAUB:**  And without belaboring the point, I

21   just want to -- and with your indulgences, and do I appreciate

22   all of the time you've given us.  I just want to stay, since

23   we've been accused of something, we have not spoken -- as

24   outside counsel, we have not spoken to the press.  And our

25   understanding is our client has not spoken to the press.

1    I think the wire services do monitor public filings,

2    and -- because we were all contacted very shortly after the

3    case was electronically filed.  And so -- but Citi has not

4    spoken and there's no public record of anyone talking to the

5    press on behalf of Citi; and Citi is not looking to make this

6    more of it than it is, so -- for what it's worth.

7        **THE COURT:**  Also, I just point out, if you're not in

8    San Francisco, we have a robust press presence who does monitor

9    all filings, every day.  Law 360 is an example -- has utilizes

10   a press/media room here in the building.  And you know, it's --

11   it's perfectly proper for press to, obviously, report on public

12   filings.

13   Anyway there doesn't seem to be a problem with that.  I'm

14   not -- I'm not concerned about that.

15   And Happy Thanksgiving, everybody.

16       **MS. FODE:**  Thank you, Your Honor.

17       **MR. RIEHLE:**  Your Honor, famous last words which is

18   one more thing.

19   And that is, with respect to discovery, we would also like

20   some discovery.  You know, one of the other standards for

21   injunctive relief, preliminary injunction, is a balance of the

22   equities.  We put it in our papers that plaintiffs have taken

23   the position repeatedly that customer lists are not trade

24   secret information, and we'd like to conduct some discovery on

25   that, say a deposition of the declarant, as well as a 30(b)(6)

1    deposition.

2         **THE COURT:**  Well, I don't know -- what you have to do

3    is any -- any requests you have for discovery, I'd have to

4    take -- I would take a look at it and listen to what the

5    parties are.

6         I mean, I don't want to -- I don't want to spend the

7    next -- for the parties to spend the next ten days or so,

8    engaged 10 depositions and 50 interrogatories and so forth.

9    Try to focus on what is at issue here, and we'll see where we

10   are.

11        You know, there may be a basis for, if you feel that you

12   need information in order to defend in a preliminary injunction

13   process, we can take a look at that and see what you need --

14   see what you need.  No, it's not a one-way street.  I agree

15   with that.

16        Okay.  Thank you.  Bye-bye.

17        **THE CLERK:**  This concludes this afternoon's hearing.

18   Thank you.

19              (Proceedings adjourned at 1:54 p.m.)

20                        ---o0o---

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Tuesday, November 26, 2024

7

8

9

10
     _____
11       Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
                Official Reporter, U.S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25